# Louisville Trust Company v. Morgan, Administrator.

(Decided May 21, 1918.)

## Appeal from Jefferson Circuit Court
## (Common Pleas Branch, Second Division).

1. Trusts—Negligence—When Trustee Liable in Individual and When in Fiduciary Capacity for Negligence.—When a trustee voluntarily commits a tort, or by his negligence, creates a liability, he must respond to the injured party in his individual and not in his fiduciary capacity. But when the trustee is acting pursuant to authority conferred by the document creating the trusteeship, he will be liable in his fiduciary and not in his individual capacity for negligence or tort.

2. Constitutional Law—Enacting Clause—Effect of Imperfections in.—Section 62 of the constitution provides that the enacting clause of acts shall read: "Be it enacted by the General Assembly of the Commonwealth of Kentucky," and where the enacting clause is wholly omitted, the act will be void, but if there is an imperfect enacting clause, as for example: "Be it enacted by the legislature of the State of Kentucky," it will not affect the validity of the act.

3. Constitutional Law—Construction of Constitution—Substantial and Technical Defects.—The provisions of the constitution should be given a mandatory construction, but legislative acts should not be declared void for frivolous and technical reasons. Sections of the constitution should be given a liberal and reasonable construction.

4. Municipal Corporations—Judicial Notice of Ordinances.—Under section 2775 of the Kentucky Statutes, the courts will take judicial notice of the ordinances of the city of Louisville.

5. Negligence—Proximate Cause—Fire Escapes.—To constitute actionable negligence there must be a concurrence of two things; first, negligence; and second, injury resulting as the proximate cause of it, and this rule applies to actions to recover damages for injuries arising out of the failure to provide fire escapes.

6. Negligence—Proximate Cause—Evidence.—Evidence sufficient to show the causal connection between the negligence and the injury may consist of circumstances and acts committed by the party charged with the negligence.

7. Negligence—Fire Escapes—Proximate Cause.—Where a statute provides that hotel buildings should be equipped with fire escapes, and that the doors and passage-ways should be arranged to facilitate egress in cases of fire, the owner of the hotel will be liable to a person injured in a fire, if his means of escape are obstructed by the failure to have the doors and passage-ways so arranged as to facilitate egress.

8. Negligence—Fire Escapes—Failure to Provide—When Not Actionable Negligence.—When it appears that a person injured in a fire could not, on account of fright or confusion or the quick spread

of the flames, or smoke, have reached fire escapes, if they had been provided, the owner of the building will not be liable for injury to him unless he was prevented from reaching the places where the fire escapes should have been erected, by the negligent construction or arrangement of the halls and passage-ways.

9. Negligence— Death— Presumptions — Contributory Negligence.— Where a person has been killed by the alleged negligence of another, there will be no presumption that he was guilty of contributory negligence. The burden of showing his negligence will be on the defendant.

GARNETT & VAN WINKLE, FRED FORCHT and EDWARDS, OGDEN & PEAK for appellant.

MILBY & HENDERSON, A. SCOTT BULLITT, KEITH L. BULLITT and BRUCE & BULLITT for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

There is located in the city of Louisville on Seventh street, a three-story building, known as the Seventh Avenue Hotel, and in December, 1915, during a fire originating in, and which partially destroyed this hotel, Charles C. Morgan, William Buckner and C. F. Buckner, who were guests at the hotel, lost their lives as a result of the fire, and this suit was brought by the administrator of Morgan against the Louisville Trust Company, as trustee owner, and landlord, and C. P. McClary, as tenant and proprietor of the hotel, to recover damages for his death. It appears that the hotel property was owned by the estate of Emma McBurnie, of which estate the Louisville Trust Company was the duly appointed, qualified and acting trustee, and as trustee it leased the property to McClary, who was operating it, at the time of the fire, as a hotel.

Originally, the suit was brought against the Louisville Trust Company as trustee of the estate of Emma McBurnie, and in its individual capacity as a corporation but upon motion to require the administrator to elect whether he would prosecute the suit against the trust company in its individual capacity or in its fiduciary capacity the court ruled that it was not liable in its fiduciary capacity and thereupon the action proceeded against it in its individual capacity. After the pleadings had been made up there was a trial before a jury and a verdict in favor of the administrator against the Louisville Trust Company for $6,000.00 and against McClary for $1,000.00, and from the judgment on this

verdict the trust company, but not McClary, prosecutes this appeal.

At this point, it will be convenient to set out such a description of the hotel building as may be necessary to an understanding of the case: The original building that composed a part of this hotel was made of brick, three stories high, and fronted on Seventh street, but afterwards a frame addition, extending along the south side of the brick building, was constructed, and the two buildings constituted the hotel at the time of the fire. The office was on the first floor of the brick building, and leading from the office to the second floor of the brick building there was a stairway going into a hall in the second floor of the brick building that extended from the front to the rear of the building. Morgan, and the Buckners, occupied, on the night of the fire, room number one in the frame building, and between this room and the other rooms and the hall in the brick building, there was a brick wall extending from Seventh street to the rear of the building.

In this wall, that separated completely room number one and the other rooms in the frame building from the brick building and the main hallway therein, there were no doors or other openings except one near the front of the building that furnished a means of exit and entrance to and from the main hall of the brick building to the frame building, and in order to go from the office to room number one, it was necessary to go up the stairway to the main hall in the brick building, then down the hall towards Seventh street to the door in the brick wall that opened into the frame building, then across the frame building to a little hall, three feet wide, on the south side of the frame building, then down this hall a few feet to a door that opened into another hall, from which hall there was a door opening into room number one, and also a door opening into room number two, room number one being back of room number two. Room number one had, in it, two doors, one opening into the little hall, above mentioned, and the other into room number two, and in the rear of room number one there were two windows that looked out on the roof of the one-story dining room and kitchen.

It is difficult to describe, so that it can be understood, the location in the hotel of room number one and the difficulty of getting from the office, or the main hall in

the brick building, to or from it, but we have been furnished with plans of the second floor that enable us to confidently say that if the architect of this frame building had endeavored to plan a room that it would be almost impossible to escape from, in case of fire in the frame building, he could not well have succeeded in locating it, and the means of ingress and egress therefrom, better than the plans show he did. If there ever was located in a building intended to be and that was used as a hotel, a room that might be described as a fire-trap, room number one fills the description. Indeed, a stranger, as it appears Morgan and these Buckners were, would find it difficult in the middle of a quiet day to make his way from room number one to the main hall and the office, to say nothing of the almost insurmountable difficulties that would present themselves if a stranger in the night, and in the midst of a fire, should attempt to find his way to a place of safety.

The fire was discovered about four o'clock in the morning by a policeman out on the street, who, at once, turned in the fire alarm, and within a few minutes thereafter the fire department reached the place, but before they got there the hotel clerk, the porter and a man named Ash had gone through the building to awaken the guests, all of whom, it appears, made their escape except these three men, who were, apparently, the only occupants of the second floor of the frame building. Ash did not testify in the case, but Louis Thompson, the porter, was introduced as a witness and said, in substance, that the fire originated in the one-story kitchen and soon enveloped the entire rear end of the frame building thereby prohibiting escape from room number one through the windows that opened out on the kitchen roof. At the time the porter reached the little hall, into which the door of room number one opened, this hall was full of suffocating smoke, and he did not go to the door of room number one to alarm the inmates because, as he said, this service had been performed by Ash whom he heard calling out "fire" and knocking on the door of room number one. When the fire department reached the building, some of the firemen made their way into this little hall, on the second floor, through the fumes and smoke and breaking open the door of room number two, which was used as a store-room, they found Morgan and the two Buckners, all of them, either

dead or in a dying condition on the floor of this room, to which it appears they had gotten from room number one through the door in the partition between these two rooms. There was also some evidence to show that the fireman found the door of room number one unlocked, and an intimation that the occupants may have attempted to make their escape through this door, but being prevented by the smoke in the hall, they turned to the door leading into room number two, hoping that they might make their escape in that way, but there were no doors or openings in that room except the door leading into room number one, and the door leading into the little hall, and so they were compelled to remain in room number two where they were suffocated by the smoke.

Turning now, to other matters, it appears that in 1914 the legislature enacted a law regulating hotels and restaurants, and in this act, which is now section 2095-A of the Kentucky Statutes, it was provided that: "In all hotels and restaurants two stories high with ten or more sleeping rooms, where sleeping accommodations are furnished to the public, there shall be provided for each twenty-five hundred feet of area or fractional part thereof an efficient chemical fire extinguisher conveniently located in a public hallway outside of the sleeping rooms, and always in condition for use, or a one and one-fourth inch inside stand-pipe with hose connection and a hose of sufficient length always attached in such a hallway, which stand-pipe shall be supplied by a sufficient pressure of water." It further provided that all hotels and restaurants more than two stories high should be equipped with an iron stairway or fire escape on the outside of the building and that: "The way of egress to such fire escapes shall at all times be kept free and clear of any and all obstructions of any and every nature."

It further appears that in 1909, the city of Louisville enacted an ordinance known as the Building Code, and in section 153 it was provided that every building three or more stories high, used as a hotel, should have at least one fire escape and as many more as might be necessary for safety, the location of the fire escapes to be subject to the approval of the inspector of buildings, and in section 183 it was further provided that: "The doors . . . and passage-ways . . . shall be arranged . . . to facilitate egress in cases of fire

or accident and to afford requisite and proper accommodations for the public protection in such cases.''

In accordance with these statutory and ordinance provisions and section 466 of the Kentucky Statutes, giving a cause of action for injuries resulting from the violations of a statute the trial court instructed the jury that: ''It was the duty of the Louisville Trust Company when it permitted the building known as the Seventh Avenue Hotel to be used as a hotel, to cause it to be equipped with an efficient chemical fire extinguisher, conveniently located in a public hallway outside of the sleeping rooms, and an inside standpipe with hose connection attached, in the hallway and supplied by sufficient pressure of water and to cause the building to be equipped with an iron stairway on the outside of the building and to cause the doors, stairways, passageways and aisles of the building to be arranged for the facilitation of egress from the sleeping rooms and all of them in case of fire.''

Coming now to the errors relied on we find it urged that the judgment should be reversed: (1) Because the Louisville Trust Company was not liable in its individual capacity. (2) The act of 1914, regulating hotels and restaurants, was void because the enacting clause was fatally defective. (3) The city ordinance was not sufficiently pleaded to be the basis of a cause of action. (4) There was no causal connection between the proven negligence and the death of Morgan, or, in other words, there was a failure to show that the negligence of the trust company, in failing to have the building equipped in the manner provided in the statute and ordinance was the proximate cause of the death of Morgan. (5) Error in the instructions, and the admission of evidence. (6) Because Morgan was guilty of such contributory negligence as to defeat a recovery.

As before stated, the trust company was sued in its fiduciary and individual character, but upon motion to elect, the trial court held that it was liable in its individual and not in its fiduciary capacity, and in so ruling, the trial court was clearly correct. The trust company controlled and managed this hotel property in its fiduciary capacity and leased it some years before the fire to McClary, or his predecessor, for hotel purposes, and at the time of the fire McClary, as tenant of the trust company, was occupying and using the building

with the knowledge and consent of the trust company for hotel purposes. It is, further, plainly made to appear that the trust company, in 1914, was notified that the hotel building was not supplied with any of the equipment, mentioned in the statute or ordinance, for the protection of guests, and that it negligently failed to take any steps to provide this equipment or any part thereof. At the time of the fire there was no fire escape on the building, or fire extinguisher, or stand pipes in the building; nor was there any door leading from room number one to the main hall in the brick building, and the means of egress and ingress to and from room number one was so arranged as to prevent, rather than facilitate, egress from this room. In short, the trust company having violated the law in leasing the building for hotel purposes wilfully failed and refused to comply with any of the requirements of the statute or ordinance, or the notice it received from the Fire Inspector, and to its neglect in these respects the death of Morgan may reasonably, if not certainly, be attributed. Under these circumstances, the general rule is that the trustee is liable in his individual and not in his official capacity, and this, for the sound reason that the trustee should not be allowed, by his tort or negligence, to impair the trust fund. 39 Cyc. 302; 11 A. and E. Encly. of Law 942; Idem 2065; City of Louisville v. O'Donaghue, 157 Ky. 243; Helling v. Boss, 121 N. Y. Supp. 1013; O'Malley v. Gerth, 67 N. J. L. 610; Blevins' Executor v. French, 84 Va. 81; Plimpton v. Richards, 59 Me. 115; Elmore v. Elmore, 58 S. C. 289, 51 L. R. A. 261; Daily v. Daily, 66 Ala. 266; Parker v. Barlow, 93 Ga. 700; Steritt v. Barker, 119 Cal. 492; Parmetor v. Barstow, 22 R. I. 245. Nor do we find in the case of Ireland v. Bowman & Cockrell, 130 Ky. 153, anything conflicting with the general principle set forth. In that case, the question of the personal liability of the trustee was not put in issue; besides the testator who, during his life, had maintained a dam in connection with a mill, that obstructed a stream, conferred upon his executors authority to continue the operation of the mill, and pursuant to the authority they were conducting the business as directed by the testator and when sued to recover damages on account of the obstruction of the stream by the dam, the court said that "If the dam was a public nuisance, J. M. Thomas could not by his will confer upon

the defendants authority to maintain it, and the trustees are answerable as trustees for any damage which they may have done by the maintenance of the nuisance. They are sued here as trustees. The trustees and devisees simply stand in the shoes of J. M. Thomas. The suit is against them as the representatives of his estate.'' But, in this case the trust company voluntarily and without testamentary direction so to do rented this property for hotel purposes when it knew, or should be charged with notice, that it was not equipped in the manner provided by law, and then, when its attention was directed to the lack of equipment, it persisted in continuing to lease the building for hotel purposes without making the improvements, or any of them that it was required by the statute and ordinance to make. Under these circumstances, it would be, as said in Plimpton v. Richards, 59 Me. 115, monstrous to hold that judgment and execution should go against the estate for a tort which the trustee had' no authority under or by virtue of its trusteeship to commit.

The attack on the validity of the legislative act of 1914 finds its only support in the fact that the title to that act reads: ''Be it enacted by the Legislature of the State of Kentucky,'' when the Constitution of the state, in section 62, provides that: ''The style of the laws of this Commonwealth shall be as follows: Be it enacted by the General Assembly of the Commonwealth of Kentucky.'' It will thus be observed that the enacting clause of this 1914 act departed from the constitutional direction in the use of the word ''Legislature'' in place of the words ''General Assembly,'' and in the use of the word ''State'' in place of the word ''Commonwealth.''

In the case of the Commonwealth v. Illinois Central Railroad Co., 160 Ky. 745, the court held that the requirement of the Constitution that the style of laws should be as directed was mandatory and, therefore, when the enacting clause, set forth in the Constitution, had been wholly omitted, there was such a departure from the Constitution as to render the proposed legislation void, and we have no disposition to depart from or question the correctness of that decision. We regard it as thoroughly sound and in keeping with numerous decisions of this court holding mandatory constitutional directions. But there is a marked difference between the failure to provide an act with any enacting

clause and the failure to provide the act with a perfect enacting clause. The act here in question has an enacting clause, but it is an imperfect one in the respect that it does not contain the precise words that it is specified in the Constitution an enacting clause should contain, but the defect is in form and not in substance, and the departure from the precise phraseology of the Constitution is neither misleading nor deceptive because the words "Legislature" and "General Assembly" are commonly used interchangeably as are the words "Commonwealth" and "State" in various sections of the Constitution, in many legislative enactments as well as in court opinions and there could be no misunderstanding on the part of any person arising from the use of the words employed in this enacting clause. Commonwealth v. Sherman, 85 Ky. 686. Under these circumstances, to hold void, for the reason suggested, an otherwise valid legislative enactment, would be sacrificing substance for mere technical form, and giving to mandatory constitutional directions a narrow, if not an absurd, meaning and effect. No court of last resort has held more consistently and firmly than has our court to the doctrine of mandatory construction of constitutional provisions, but we have as consistently refused to overthrow legislative enactments for frivolous and purely technical reasons.

The ruling in the case of McCreary, Governor v. Speer, 156 Ky. 783, is relied on, but plainly it does not support counsel or conflict with what we have said, because in that case the legislature fixed sixty days as the time the notice of a vote on a proposed amendment should be advertised when the Constitution directed that ninety days' notice should be given, and the court ruled that this was a substantial departure from the constitutional direction, and that it was, admits of no doubt.

The principle that has controlled us in constitutional construction was thus stated by the court in Board of Penitentiary Commissioners v. Spencer, 159 Ky. 255, where it was said: "At the threshold of what we have to say it might be well to observe that this court has no disposition to give a narrow or technical construction to the section of the Constitution under consideration, or a construction that would make it difficult or impracticable for the legislature to phrase or construct titles

or acts that would not be obnoxious to this provision of the Constitution. The section should be liberally construed so as not to hinder or embarrass the legislature in its efforts to enact laws, but at the same time a construction so loose as to virtually nullify the section, which is mandatory in its terms, should not be adopted. . . . . Running through all of them (the cases) will be found the determined purpose of this court to enforce substantial compliance with this section, while giving to it a reasonable and liberal construction.'' We are, therefore, of the opinion that the validity of the act was not affected by the imperfections in the enacting clause.

As to the objection that the ordinance of the city was not properly pleaded, the petition charged that the hotel was being operated in violation of the ordinance, and specified the particulars in which the violation consisted, and in the reply it was further averred that the directions of the building inspector to the trust company in respect to equipping this building in the manner provided by the ordinance was pursuant to ''An ordinance of the city of Louisville, approved August 4, 1909, and entitled an ordinance establishing and providing for a Department of Building for the city of Louisville, and regulating the construction, equipment, maintenance, alteration, repairing and removing of buildings and the occupancy, obstruction of streets and alleys in the performance of same and provided certain penalties for the violation thereof, same to be known and cited as the building code.'' These averments were, as we think, substantially sufficient to comply with the practice and especially so in view of section 2775 of the Kentucky Statutes providing that the courts shall take judicial notice of the ordinances of the city.

It is also urgently insisted by counsel that there was a total failure to show that the negligence of the trust company in the respects mentioned was the proximate cause of the death of Morgan and, therefore, there could be no recovery against it. If it should be admitted that there was no causal connection between the proven negligence and the proven injury, then the argument of counsel would be well founded, because it is the settled rule, not only in this state but in other jurisdictions, that there can be no recovery for injury or loss occasioned by negligence, unless the complaining party can show that the negligence charged contributed to or

brought about the injury or loss complained of. Thus it was said in Conway v. Louisville & Nashville Railroad Company, 135 Ky. 229, that: "There is also a plain elementary principle of negligence law that to constitute actionable negligence there must be a concurrence of two things: First, negligence; and, second, injury resulting as a proximate cause of it. It matters not how negligent a person may be, his negligence, unless the injuries complained of were the proximate result of it, will not authorize a recovery in damages." To the same effect are Davis v. Ohio Valley Banking & Trust Company, 127 Ky. 800; Conley v. Ennis, 170 Ky. 125; C., N. O. & T. P. Railway Company v. Perkins, 177 Ky. 88.

This principle in the law of negligence, although it has not heretofore been applied by this court to a case like this as this is the first of this kind that has come before us, has often been laid down by other courts as applicable to injuries resulting from the negligent failure to provide buildings with fire escapes and other safety equipment. Weeks v. McNulty, 101 Tenn. 495, 43 L. R. A. 185; Pauley v. Steam Gauge & Lantern Company, 131 N. Y. 90, 15 L. R. A. 194; Arnold v. National Starch Company, 194 N. Y. 42, 21 L. R. A. (N. S.) 178; Radley v. Knipley, 104, Texas Rep. 130.

Let us see, now, if there is not evidence, direct or circumstantial, tending to sufficiently show a causal connection between the negligence of the trust company and the death of Morgan, and in considering this feature of the case, it should here be said that it is not essential that the causal connection should be shown by direct evidence; indeed, direct evidence in many cases like this would be difficult, if not impossible, to obtain, although there might be ample circumstantial evidence to sustain the cause of action, and so, when the causal connection can be shown by circumstances, these circumstances will be equally as effective as direct evidence would be.

Nor is it indispensable that the evidence showing the connection between the negligence and the injury should be exhibited by the acts or declarations of the injured party, as it may be shown by facts and circumstances entirely independent of anything that he said or did, as, for example, by the acts of the party charged with negligence if these acts were of such a nature as that but for them the injury would not have happened.

When, however, the complaining party has some means of escape from an impending danger that he could have availed himself of, or when the means of avoiding it is open to his choice, the negligence will not generally be regarded as the proximate cause of the injury in the absence of facts or circumstances showing the connection between the two. To illustrate, if the halls and doors in this building had been so arranged as to faciliate egress in case of fire, and it appeared that Morgan was unable to or failed to make his escape on account of fright, or confusion, or delay on his part, or because he was not awakened in time or because of the rapidity with which the flames spread, or the smoke filling the halls, then we would have a case where the causal connection between the negligence and the injury was lacking.

But this general rule, so often applied in negligence cases, should have no controlling weight in a case where the injured party, on account of the negligence of the other party, has no means of escape, and there is not open to him any way by which he can avoid the impending danger.

If this were not so, then the greater the negligence the less the liability would be, and the rights of the injured party would be diminished in the same ratio that the negligence was increased, when the converse is true, and the greater the negligence the greater the liability.

Coming, now, to apply what we have said to the facts of this case, we think the evidence shows that the failure of Morgan to escape was not caused by fright or confusion or delay on his part, or by the rapidity by which the fire spread or the smoke filled the halls or by the fact that he was not awakened in time, but by the unsafe and dangerous construction of the interior of the hotel that prevented Morgan from reaching a fire escape if one had been provided, and, therefore, the rule laid down in the case of Weeks v. McNulty, *supra,* and others cited by counsel, has little application to the facts in this case. In the Weeks case, the court based its opinion that there was no causal connection between the negligence and the injury, upon facts showing that the injured party could not have reached the fire escapes if they had been erected, on account of the rapid spread of the flames, and other acts committed by him in his fright caused by the presence of the fire; and so in the Radley case.

But in no one of those cases was it made to appear, as in this one, that the injured party would have been prevented from reaching fire escapes if they had been erected by obstacles and obstructions placed in his way by the negligent and unsafe manner in which the hotel was constructed.

A case supporting the doctrine that obstacles and obstructions arising from defects in construction, or maintenance, will furnish the connecting link between the negligence and injury is Arnold v. National Starch Company, *supra*. In that case, suit was brought by a party, injured in a fire, to recover damages on account of the failure to have the building equipped with fire escapes, and one of the defenses was that the failure to have the fire escapes was not the proximate cause of the injury. In discussing this point, the court said: "But, it is further urged in behalf of respondent that its failure to comply with the statute, even if mandatory, may not be made the basis of a recovery for any damages sustained by appellant on the occasion in question, because it was not established that the injuries resulted from such failure. This argument rests on two propositions, the first one being that other sufficient means of escape were provided, and the second one that appellant's clothes and hair took fire immediately when the conflagration reached the room where she was, and that, therefore, her damages accrued before she could possibly have reached the fire escape if provided. The evidence, in my judgment, permitted the jury to find against this argument, and both of the propositions involved in it. . . . . And, on the other proposition, while the evidence may not establish with mathematical accuracy just when the fire reached appellant's clothes and person with reference to its first appearance on the floor, or with reference to her final escape therefrom many minutes afterwards, still, as I read it, it permitted the jury to find that, as the result of an accumulation of inflammable dust and material, the fire spread very rapidly throughout the floor; that appellant came in contact with it, and was set on fire some time after it first appeared; and that, if there had been statutory and convenient fire escapes from the windows, she might have escaped thereby before becoming on fire, and, conversely, that the failure to comply with the statute resulted in her detention in the burning room for many un-

necessary minutes, and that such detention and inability to escape caused and contributed to her injuries.''

Another case is Kohn v. Clark, 236 Pa. St. 18, A. & E. Ann. Cases 30, p. 775. In that case the plaintiff brought suit to recover damages upon the ground that the building in which he was employed was not equipped with fire escapes. The trial court directed a verdict in favor of the defendant upon the ground that it did not appear that the failure to provide the building with fire escapes was the proximate cause of the injury complained of; in considering this feature of the case, the court said that the statute provided that ''The number and location of such escapes to be governed by the size of the building and the number of its inmates and arranged in such a way as to make them reasonably accessible, safe and adequate for the escape of said inmates,'' and that ''Whether the one external fire escape that was here constructed was an adequate provision for escape during a fire, considering the size of the building and the number of inmates, and whether it was so arranged to make it readily accessible, safe and adequate for the escape of the inmates, was clearly questions for the jury. We have no disposition to weaken by refinement of construction the obligation which this wise and salutary legislation imposes on the owners of such buildings. The act provides an easy way by which they may relieve themselves of responsibility. . . . . So too we think the question of proximate cause was for the jury. It may be that one cause of plaintiff's failure to escape unhurt was want of familiarity on the part of the operatives with the means of escape that had been provided; but, suppose the means provided were bound to be short of what the law requires—a matter which the jury as we have said alone could determine—in such case to hold want of familiarity to have been the proximate cause, is to imply a duty on the part of the employer to make good the owner's default, by instructing and training his employees as to the best way of using inadequate means of escape.''

What circumstances, it may be inquired, are in the record conducing to show that the death of Morgan was attributable to the failure to have this building equipped in the manner pointed out in the instructions, and conducing to show that the negligent construction of the

building and the location of room number one, would have prevented Morgan from reaching the fire escape, if the building had been supplied with one?

Morgan and his companions, it should be kept in mind, died before they had an opportunity to make any statement connected with the transaction, and as no one else saw or heard them from the time they entered this room until the fireman discovered them in a dead or dying condition in room number two, there is a total failure to show what efforts they made to escape, aside from the circumstance that they broke the door and went from room number one into room number two, and the further circumstance that the door of room number one, opening into the little hall, was unlocked, but that they did make every possible effort that men, situated as they were, could make to escape, cannot be doubted in the light of universal human experience. But, it is said by counsel that the flames and fumes and smoke spread through the hallways so rapidly that these men could not have staid the fire with a chemical extinguisher, or a hose if there had been one in the hall, nor could they have found their way to a fire escape in the front of the building if one had been there located. Possibly, indeed probably, this may be so in view of the unsafe and dangerous construction of the interior of the hotel, when considered in connection with the location of the room occupied by these men. Proceeding now with this argument a little further, the effect of it is that if guests in a hotel are put in a room from which escape, in case of fire, would be extremely difficult, if not wholly impracticable, there should be no recovery on account of the want of safety equipment, because if the equipment had been supplied the guests could not avail themselves of its protection. To so construe the statute and ordinance would be to destroy the very purpose of their enactment, and give to them a meaning that would enable owners and lessees of fire traps, like the Seventh Avenue Hotel, to escape liability upon the ground that the rooms and halls were so located and situated as that guests could not avail themselves of fire escapes and other safety equipment if they had been provided. Of course, we can not agree that the useful provisions of the statute and ordinance should be made worthless by such a construction. They were intended to promote the safety of guests in hotel buildings, and to afford

them means of escape from injury and death in cases of fire, which are not infrequent occurrences in hotel buildings, and they should be given such a reasonable construction as would carry out the wholesome intent in their enactment.

Turning again to these legislative enactments we find it provided that the hotel should be equipped with a fire escape and that "The way of egress to such fire escapes shall, at all times, be kept free and clear of any and all obstructions of any and every nature," and further that: "The doors and passage-ways shall be arranged to facilitate egress in cases of fire, and to afford requisite and proper accommodations for the public protection in such cases." It would be folly to erect fire escapes that were inaccessible, and, therefore, the plain meaning of these provisions is that the doors and halls in the hotel should be so arranged as to facilitate egress in cases of fire and kept in such condition as to be, at all times and under all circumstances, free from obstructions of every kind, and so the statute and ordinance contemplated not only that the buildings shall be provided with fire escapes, but that the doors and passage-ways shall be so arranged as to facilitate egress in cases of fire, and it is equally as great a violation of these legislative requirements to fail to have the doors and passage-ways so arranged and kept, as it is to fail to have the building supplied with fire escapes.

Now, we think it clear that the doors and hallways leading from room number one were not so located or arranged as to facilitate egress in cases of fire, or to afford requisite and proper accommodations for the protection of guests; on the contrary, they were so located and arranged as to prevent egress in cases of fire and to deny the requisite protection, and, therefore, the trust company will not be heard to say that Morgan could not have found his way to a fire escape if one had been put up, or have found his way out of the room to a place of safety, if the building had been equipped with water and fire extinguishers.

In such a state of case as is here presented, the presumption is that Morgan could and would have escaped if the doors and halls had been so arranged as to facilitate egress and the building had been equipped with requisite appliances. For example, if there had been a door, as there should have been, opening from room

number one into the main hall in the brick building, it is scarcely to be doubted that Morgan and his companions could easily have made their escape, but as it was, they had no means of escape. Their means of escape had been cut off by the manner in which the hotel was constructed and maintained in violation of the statute and ordinance.

No presumption of negligence or that the failure of Morgan to escape was due to causes within his control is to be indulged in. In cases where death ensues as the result of a negligent act there is no presumption of contributory negligence on the part of the deceased. Contributory negligence may, of course, be relied on as a defense, but the burden of showing it is on the defendant. Anglea's Admr. v. East Tennessee Telephone Company, 142 Ky. 539; Stuart's Admr. v. Nashville, Chattanooga and St. Louis Railway Company, 146 Ky. 127; Osborne's Admr. v. Cincinnati, New Orleans & Texas Pacific Railway Company, 158 Ky. 175.

We, therefore, think that there was sufficient circumstantial evidence to take the case to the jury on the issue that the failure to have the building arranged and equipped in the manner pointed out in the instruction was the proximate cause of the death of Morgan.

Some effort is made to show that Morgan, on the night in question, was intoxicated, but we shall not take up time with this issue put in the case for the purpose of endeavoring to make out a defense of contributory negligence. Sufficient is it to say that there is no material evidence supporting this contention. Nor do we find any substantial error committed by the trial court in the instructions, or in the admission of evidence.

The judgment is affirmed.