J. Truman YONCE, Jr., and Truman C. Yonce, Sr., Plaintiffs,

v.

The MINERS MEMORIAL HOSPITAL ASSN., Inc.; United Mine Workers of America Welfare and Retirement Fund, an unincorporated association; United Mine Workers of America, an unincorporated association; The Royal Laundry Co., Inc.; and The Victor Kramer Co., Inc., Defendants.

Civ. A. No. 411.

United States District Court
W. D. Virginia,
Lynchburg Division.

April 3, 1958.

William Rosenberger, Jr., Lynchburg, Va., Franklin M. Schultz, Purcell & Nelson, Washington, D. C., for plaintiffs.

Stuart B. Campbell, Campbell & Campbell, Wytheville, Va., Val. J. Mitch, Harold H. Bacon, Washington, D. C., Waldo G. Miles, Bristol, Va., and Royston Jester, III, Lynchburg, Va., for defendants.

THOMPSON, District Judge.

This is an action by J. Truman Yonce, Jr. and Truman C. Yonce, Sr., of Norton, Virginia, plaintiffs, doing business as Superior Laundry, against The Miners Memorial Hospital Association; United Mine Workers of America Welfare and Retirement Fund, an unincorporated association; United Mine Workers of America, an unincorporated association; The Royal Laundry Co., Inc.; and The Victor Kramer Co., Inc., defendants.

The complaint has two counts, the first of which asserts a claim for an alleged breach of contract against a single defendant, The Miners Memorial Hospital Association, Inc. The first count is not involved in the motions now before the Court.

The second count asserts a claim against all of the defendants and charges a violation of Sections 1 and 2 of the Sherman Antitrust Act and prays for treble damages and an injunction.

The jurisdiction requirements for count number two are set forth in the complaint as follows:

"(b) The jurisdiction of this Court is based upon Sections 1 and 2 of an Act of Congress of July 2, 1890, commonly known as the Sherman Act (26 Stat. 209, 15 U.S.C. §§ 1 and 2), and Sections 4 and 16 of an Act of October 15, 1914, commonly known as the Clayton Anti-Trust Act (38 Stat. 731, 737, 15 U.S.C. §§ 15, 26) and the Act of June 25, 1948 (62 Stat. 931, 28 U.S. C. § 1337).

"(c) Each defendant resides, is found, has an agent, or transacts business in the Western District of Virginia."

The plaintiffs charge that the defendants engaged in an unlawful combina-

tion and conspired to restrain and monopolize the commercial laundry and dry cleaning services in Norton, Virginia and the multi-state area within a radius of fifty miles of Norton, Virginia, and that the purpose and effect of this unlawful combination was to monopolize the commercial laundry service in the area, to destroy and eliminate the laundry service business of the plaintiffs and to channel the laundry services to The Royal Laundry Co., Inc., and thereby give Royal a monopoly in the laundry services in that area.

### Description of Parties

The Miners Memorial Hospital Association, Inc. is a foreign corporation incorporated under the laws of the State of Kentucky and has its principal office in Washington, D. C. It will be referred to as "Miners".

United Mine Workers of America Welfare and Retirement Fund is alleged to be an unincorporated association. It is a Trust created in the National Bituminous Coal Wage Agreement of 1950, pursuant to the authority of the Labor-Management Relationship Act of 1947. The Trust is administered by three trustees. The trustees are selected: one by the coal operators, who is Charles A. Owens, a resident of New York City, New York; one by the Union (United Mine Workers of America, Inc.), who is John L. Lewis, a resident of Alexandria, Virginia; and the neutral trustee is selected by the Union and the coal operators, signatory to the contract; they have selected Josephone Roche, who resides in Denver, Colorado. It will be referred to as the "Fund".

United Mine Workers of America, Inc. is a Labor Organization with its president, John L. Lewis, residing in Alexandria, Virginia. It will be referred to hereafter as the "Union".

The Royal Laundry Co., Inc. is a Virginia corporation and has its principal office at Norton, Virginia. It will be referred to hereafter as "Royal".

The Victor Kramer Co., Inc., is a foreign corporation with its principal offices in New York City, New York. It will be referred to hereafter as "Kramer".

The plaintiffs, J. Truman Yonce, Jr. and Truman C. Yonce, Sr., are residents of Norton, Virginia, and do business under the trade name of Superior Laundry. They will be referred to hereafter as "Superior".

There are three motions now before the Court for disposition; briefly they are as follows:

### First

Motion of Kramer to quash the service of process upon it and to dismiss the complaint as to it upon the ground that it was "not found or doing business in the State of Virginia" so as to be amenable to process served upon it through the Secretary of the Commonwealth of Virginia.

### Second

Motion of the Fund to dismiss the complaint upon the following grounds:

"1. The defendant is not an unincorporated association, but is a trust created by the National Bituminous Coal Wage Agreement of 1950 (a copy of which is attached hereto and incorporated as part hereof as Exhibit A), pursuant to Section 302(c) (5) of the Labor-Management Relations Act, 1947 [29 U.S.C.A. § 186(c) (5)] and cannot be sued in the manner attempted in this complaint.

"2. Service of process has been obtained only as to John L. Lewis, as Trustee of the United Mine Workers of America Welfare and Retirement Fund, and no other trustee has been served.

"3. The Court does not have jurisdiction of the defendant, United Mine Workers of America Welfare and Retirement Fund."

### Third

Motion of Union, Miners, Kramer and Royal to dismiss the complaint on the ground that this action was brought in the Lynchburg Division of the Western Judicial District of Virginia, instead of

the Abingdon Division of said District, where it is alleged that the cause of action arose, and, if this motion is not granted, they move to transfer the case to the Abingdon Division for trial.

The Court will consider the motions seriatim. The Court's findings as to the facts, from the record now before it, as they pertain to each of the motions will be set forth in the memorandum dealing with each motion.

### Kramer's Motion to Dismiss

#### Findings of Fact

1. Kramer is a foreign corporation; its principal office is in New York City, New York; it had no office in Virginia; it had not appointed a process agent in Virginia and had not designated the Secretary of the Commonwealth of Virginia as its process agent.

Process was served on Kramer in this proceeding by serving the summons and complaint upon the Secretary of the Commonwealth of Virginia, as provided by Section 13–217 of the Code of Virginia 1950, as amended.

2. Kramer is engaged in the service business of laundry management consultants and has various clients—hotels, hospitals and laundries—who employ its services as laundry consultants. It was organized, created and chartered for the purpose of furnishing such services. It has a staff of trained consultants and transacts its business wherever it finds an enterprise that desires the use of its services, whether it be in the State of New York, New Jersey, Virginia or elsewhere.

3. Miners operates ten hospitals in the coal mining sections of Virginia, West Virginia and Kentucky, in the towns of Wise, in Virginia; Middlesboro, Harlan, Hazard, McDowell, Pikesville and Whitesburg, in Kentucky; Williamson, Man and Beckley, in West Virginia. Laundry service for Miners' several hospitals is furnished by the commercial laundries operated by Royal and Superior at Norton, Virginia; Big Stone Gap, Virginia; and Grundy, Virginia.

4. Royal operated laundries at Norton, Grundy and Big Stone Gap, Virginia, and supplied the laundry services for Miners' hospitals at Pikesville, McDowell, Man and Williamson.

5. Superior operated a laundry at Norton, Virginia, and supplied the laundry service for Miners' hospitals at Wise, Harlan, Hazard, Whitesburg, Middlesboro and Beckley.

6. The Wise hospital and the four laundries here involved were located in the Western District of Virginia; these laundries furnished the laundry service for all ten of Miners' hospitals.

7. Kramer entered into an agreement with Miners in November, 1956, to make a survey of the laundry situation in Miners' ten hospitals and the services being rendered to Miners by the four laundries then serving Miners' hospitals. Kramer spent approximately two weeks in the area of the location of the laundries and the hospitals in connection with its survey. When the survey was completed Kramer submitted to Miners a voluminous report of its survey. After receiving Kramer's report, Miners employed Kramer's services. On January 25, 1957, Kramer entered into an agreement of indefinite duration with Miners to serve as laundry management consultants, in which Kramer agreed to negotiate revised contracts with both Royal and Superior—to revise Royal's contract so it would process a greater portion of Miners' work, redistribute the laundry load among Royal's laundry plants, expand their facilities and acquire new machinery, improve the methods of handling the laundry and other miscellaneous changes, so as to furnish Miners with quality laundry service. Kramer was also to negotiate a revised contract with Superior so that it would process a smaller portion of Miners' laundry work and to improve the quality and service of Superior by requiring it to install hot water heaters, employ a plant superintendent, process Miners' laundry on day shifts only and to change and modify their laundering methods, so as to be able to furnish Miners with quality laundry

service. Kramer was to follow through and to oversee all of the required implementations of the laundries and to work with, guide and advise the laundry personnel to the extent necessary to produce measurable improvements.

8. Kramer was to assist Miners in effectuating the execution of any changes or modifications made by Miners as a result of Kramer's recommendations. It agreed to guide Miners on policy, methods and "things to do" and to devote as much time and energy to all of these undertakings as was reasonably necessary and to be present wherever needed. If Kramer was unable to negotiate satisfactory revisions of the laundry contracts with Royal and Superior, then Kramer was to negotiate for adequate laundry service with other commercial laundries to the end that Miners would at all times receive quality laundry service for all of its hospitals.

9. Kramer was to receive a fee of $1,100 a month beginning February 1, 1957, for its services for an indefinite period, subject to cancellation upon sixty days notice by either party.

10. Kramer spent approximately two weeks in Virginia, Kentucky and West Virginia making its original survey of the four laundry plants and the hospitals. Kramer's report to Miners of the results of its survey consisted of seventy-five pages of typewritten material. Much of the two weeks spent in making the survey was spent in Virginia evaluating the four laundries located in Virginia. Forty-one pages of Kramer's report to Miners dealt with its investigation, evaluation and recommendations of the four laundries.

11. In Kramer's evaluation of the facilities of the four laundries, it considered each machine—the make, size, type, mechanical condition and capacity—and reported to Miners in detail as to whether the machinery and plants were modern or outmoded, and their capacities.

12. The principal deficiencies discovered by Kramer in its survey had to do with the four laundries located in Virginia. The recommended changes in the procedure of the laundry services within the hospitals were much more easily accomplished than were the needed changes in the laundries. The changes in the laundries were substantial and required considerable time for accomplishment. Kramer had one and sometimes two of its consultants in the Western District of Virginia, where the four laundries are located, at fairly close intervals, from February to October, 1957, in its endeavor to accomplish the recommendations contained in its original survey. The expense account of one of the consultants discloses that he had expenses in the area where the laundries and the hospitals are located on twenty-four different days between February 18th and October 31st. Mr. Schweid and Mr. Passmore, two of Kramer's consultants, were in the area early in 1957 to negotiate revised contracts with Royal and Superior and to effectuate the needed changes in the laundry plants such as plant expansion, adding new equipment, securing additional supervisory personnel, and otherwise doing what Kramer considered necessary in each of the laundries to bring the plant, machinery and technique up to the standards recommended by Kramer.

As early as March 5, 1957, Kramer reported to Miners that they had completed their preliminary negotiations for revised contracts with Royal and Superior, and forwarded to Miners their working notes and outline of their negotiations, and advised Miners that Kramer was planning a program for the rehabilitation of Superior and was sending consultant Passmore to Norton, Virginia, to start the rehabilitation program.

13. In this rehabilitation program, Kramer required Superior to install additional equipment, to hire a laundry superintendent, to process Miners laundry only on day shifts, to increase its plant space and facilities, and to make basic changes in its laundry technique. Kramer agreed to furnish Superior with its expert training in these changeovers and the new processes; it furnished Superior with a list of things Superior would be

required to do to furnish the quality laundry service that Kramer expected. Kramer recommended that the amount of laundry that Superior was servicing be reduced and redistributed, by taking from Superior the Beckley and Middlesboro laundry and shifting the same to Royal.

Kramer advised Royal as to the kind and type of new machinery that would be required of it to take care of the additional laundry business that was being transferred from Superior to it, and otherwise advised both Royal and Superior as to Kramer's method of operation and procedure in the handling of the laundry to bring about quality service.

14. In short, Kramer, as it agreed to do in its contract of employment with Miners, was present in Virginia to do everything it thought was needed to be done in connection with the four laundries and the hospitals to bring about the results suggested in its report of its original survey.

## Conclusions of Law

1. Kramer contends that the service of process on it was invalid because it was not a resident of Virginia, did not have its principal office or any office in Virginia, it was not found in Virginia and had no agent in Virginia, relying upon Section 4 of the Clayton Act (38 Stat. 731, 15 U.S.C.A. § 15).

This contention is untenable in view of the provisions of Section 12 of the Clayton Act (38 Stat. 736, 15 U.S. C.A. § 22), which provides:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or *transacts business.* * * * "

It follows that if Kramer was doing business in the Western District of Virginia it is amenable to process served on it through the Secretary of the Commonwealth of Virginia. Sec. 12, 38 Stat. 736, 15 U.S.C.A. § 22; Eastman Kodak Co. of New York v. Southern Photo Ma-

terials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L. Ed. 1091.

The question of what constitutes doing or transacting business is one of fact and must be determined largely according to the facts of each case. Atlantic Greyhound Lines, Inc. of West Virginia v. Metz, 4 Cir., 70 F.2d 166; 20 C.J.S. Corporations § 1828.

Kramer was organized and chartered to do the kind of business it transacted in Virginia. Kramer could not contend, if the same services had been performed in the State of New York as were rendered in the State of Virginia, that it was not transacting business in New York. It was in Virginia carrying out its primary corporate purpose and discharging an essential corporate function. The services rendered and the work done in Virginia were exactly the same type of services rendered and kind of work done in New York and other states. If a corporation is engaged in promoting or carrying out a substantial amount of its corporate business in a foreign state, it is engaged in transacting business in that state. Ku Klux Klan v. Commonwealth, 138 Va. 500, 122 S.E. 122; Tignor v. L. G. Balfour & Co., 167 Va. 58, 187 S.E. 468; Michie's Jur., Vol. 4, Sec. 288, at p. 826.

The business activities of Kramer in Virginia are the same activities—the substantive acts—upon which the plaintiff bases its antitrust allegation against Kramer. If Kramer in the conduct of its business in Virginia has violated the antitrust law, then it is amenable to process of this Court. As was said in United States v. Scophony Corp., supra, a foreign corporation can no longer come to a district, perpetrate there the injury outlawed, and then retreat to its headquarters and defeat or delay retribution.

The Court is of the opinion that Kramer was transacting business in the Western District of Virginia, that process was properly served on it through

the Secretary of the Commonwealth of Virginia, that Kramer has subjected itself to the jurisdiction of the United States District Court for the Western District of Virginia, and that Kramer's motion to quash the process and dismiss the complaint should be denied. An order will be entered accordingly.

### The Fund's Motion to Dismiss

#### Findings of Facts

The United Mine Workers of America Welfare and Retirement Fund was created pursuant to and in conformity with the provisions of the Labor-Management Relations Act of 1947. The Fund was established in the collective bargaining agreement known as the National Bituminous Coal Wage Agreement of 1950 between various bituminous coal operators and the United Mine Workers of America, a Labor Union, representing the employees of the various coal operators signatory to said agreement.

Under this agreement the operators, signatory thereto agreed to pay to the Fund 30¢ per ton (now 40¢ per ton) on each ton of coal produced for sale by them. The Fund's place of business is Washington, D. C.; it is administered by a three member Board of Trustees, one selected by the operators, one by the Union and a neutral trustee selected by the other two. The agreement provides if the two trustees so selected cannot agree upon the neutral trustee, the United States District Court for the District of Columbia is to appoint the neutral trustee. The trustees are to serve as long as the continuation of the administration of the Trust is required.

In the agreement establishing the Fund it is referred to as an irrevocable trust and is to continue as long as the purposes for its creation exist. It is to be administered for the benefit of the employees of the signatory operators, their families and dependents, for their medical or hospital care, pensions, retirement compensation, injuries and other benefits to the employees and their families as therein stated. The trustees determine eligibility, amount of benefits to be paid, invest the funds, and administer all other related matters.

The operators, at regular intervals, remit their payments to the Fund at its headquarters in Washington, D. C. Neither of the parties signatory to the agreement or the beneficiaries have any voice in the method of the administration of the Fund. It is administered solely by said Board of Trustees. John L. Lewis, who resides in Alexandria, Virginia, is Chairman of the Board of Trustees.

This action is against the Fund and not the trustees. Process was served as follows:

"Service of this summons is hereby acknowledged with the same effect as if the summons had been served in person on John L. Lewis, as Trustee of the United Mine Workers of America Welfare and Retirement Fund.

"s/ Val J. Mitch
"900 15th St. N. W.
"Washington, D. C."

The complaint alleges that the Fund, acting jointly and severally by and through its agents, together with others unknown to the plaintiffs, engaged in an unlawful combination and conspiracy in the Western Judicial District of Virginia to restrain and to monopolize trade and commerce in the commercial laundry and dry cleaning services in the States of Virginia, West Virginia and Kentucky, in violation of Secs. 1 and 2 of the Sherman Antitrust Act.

#### Conclusions of Law

The plaintiffs contend that the Fund is an unincorporated association and as such is suable for the purpose of enforcing a Federal substantive right such as is involved here, by virtue of the provisions of Rule 17(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., and the provisions of Section 8–66 of the Code of Virginia, 1950, as amended, relating to the capacity to sue or be sued and the method of serving process.

The defendant contends it is not an unincorporated association, but is a Trust and being a Trust that it is not liable for the tortious acts of a trustee, that service of process on only one of the trustees does not constitute valid process on the Fund, and that in no event can the Fund, since it is a Trust, be sued in this action for a tort alleged to have been committed by it, and that if the trustees have committed a wrongful act in violation of the law, which resulted in injuries to the plaintiffs, the trustees would be personally liable, and that there would be no liability therefor on the Fund.

■ The Court finds as a matter of law that the Fund is a Trust and is not an unincorporated association in the sense contemplated by Rule 17(b) of the Federal Rules of Civil Procedure and Section 8–66 of the Code of Virginia.

■ The words "unincorporated association", as employed in Rule 17(b) of the Federal Rules of Civil Procedure and Section 8–66 of the Code of Virginia above mentioned, denote a voluntary group of persons joined together by mutual consent for the purpose of promoting some stated objective. Such an association suggests an organized group made up of persons who become members of the association voluntarily, but subject to certain rules or by-laws; the members are customarily subject to discipline for violations or non-compliance with the rules of the association. The word "association" as here used refers to associations such as trade unions, fraternal organizations, business organizations, and the like.

The Fund has no membership or any of the other characteristics usually found in an unincorporated association. The Board of Trustees of the Fund receive and pay out the funds in accordance with the general plan set out in the trust agreement. The trustees are acting in a fiduciary capacity and are limited in their activities by the terms of the trust agreement. They are not permitted (as they might be if they were an "associa-tion" of three individuals) to prescribe the conditions or qualifications of their membership or their duties, to enlarge or reduce their membership, to enlarge or decrease the scope of their activities, to dissolve the association, or to do many of the other things that they would be permitted to do if the three trustees were an "association".

The distinction betwen an "association" and a "Trust" is discussed in the case of Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 356, 357, 56 S.Ct. 289, 80 L.Ed. 263, 270, 271. Also see Equitable Trust Co. v. Magruder, D.C., 37 F.Supp. 711, at page 714.

The Labor-Management Relations Act of 1947, under the provisions of which the Fund was established, recognizes that the money paid into the Fund as provided by the Act constitutes a trust fund. It is there stated:

"(c) The provisions of this section shall not be applicable * * * ; (5) With respect to money or other thing of value paid to a *trust fund* established by such representatives." 29 U.S.C.A. Sec. 186(c) (5).

In the case of United Marine Division v. Essex Transportation Co., 3 Cir., 216 F.2d 410, 412, the Court held that the fund created pursuant to the Act was a Trust and set out the legislative history of the Act, showing that it was the intent of Congress that money paid into the Trust should constitute a trust fund for the sole benefit of the beneficiaries, and to be administered solely by the trustees, free from the control of either the operators or the union. The Court in this case had this to say:

"With this background it is not hard to see what the lawmakers were after. They were forbidding money to be paid to representatives of unions unless through a trust fund, the requirements for which were set up in some detail.

"We think that in this instance the promise of the employer (if indeed the promise was made) was not a promise 'to any representatives

of any of his employees.' The promise alleged was to pay these trustees. These trustees were not, in our judgment, representatives of the employees. They were trustees of a welfare fund. It is true that they were chosen half and half by the employers' association and this union. But we think that when set up as a board, as they were in this case, these individuals are not acting as representatives of either union or employers. They are trustees of a fund and have fiduciary duties in connection therewith as do any other trustees. The terms under which they act were carefully spelled out."

Other courts in cases involving the fund have declared it to be a Trust:

"1. The Welfare and Retirement provisions of the National Bituminous Coal Wage Agreement of 1947, made between the operators signatory thereto and the United Mine Workers of America, do not violate either the letter or spirit of the Labor Management Relations Act, 1947.

"2. The United Mine Workers of America Welfare and Retirement Fund, set up in said Agreement, constitutes a beneficial charitable trust, and a majority of the Trustees have the right to act in the activation and administration of that Trust." Van Horn v. Lewis, D.C., 79 F.Supp. 541, 545.

See also Hobbs v. Lewis, 197 Tenn. 44, 270 S.W.2d 352. The Common Pleas Court of Washington County, Pennsylvania, in banc, in the case of Zeremenko v. United Mine Workers' Fund, 37 Wash. Co. Rep. 219, in considering the status of the Fund had this to say:

"Testimony was taken by interrogatories and cross-interrogatories. As a result of this testimony it appears that this defendant is a trust, maintaining its office in Washington, D. C.; that its administration is in Washington, D. C., where all remittances to the fund are made and all

its moneys are kept on deposit; all evidence of the investment of assets of the fund are held there; the officials of the fund maintain their offices there, all minutes and other official records pertaining to the trust are kept there and the assets of the fund consist entirely of personal property. It also appears that the trustees are citizens of three different states." Pittsburgh Legal Journal Vol. 105, p. 5.

It would appear that all of the courts that have had an occasion to consider the status of the Fund have treated it as a Trust.

"Union welfare or trust funds, as far as case law is concerned, is something new in the law. Despite the rarity of decisions involving them however, the benign light in which the courts will view them has already appeared on the horizon. As seen in United Garment Workers of America v. Jacob Reed's Sons, D.C. E.D.Pa., 83 F.Supp. 49, at page 52: 'The Court considers such funds as rather sacred, and it is the purpose of the law that they be available when due under the contract'." Upholsterers' International Union v. Leathercraft Furniture Co., D.C., 82 F.Supp. 570, at page 575.

See also Lewis v. Quality Coal Corp., 7 Cir., 243 F.2d 769.

For the reasons set forth above, the Court finds that the Fund is a Trust and is not an "unincorporated association".

The plaintiffs have sued the Fund as an entity, which the Court has held to be a Trust. They seek to obtain a judgment against the Fund for acts which the plaintiffs allege were unlawful and tortious in violation of Secs. 1 and 2 of the Sherman Antitrust Act.

The Fund can act only by and through its Board of Trustees, and when it is alleged that the Fund committed a tort, it must be construed to mean that the Trustees of the Fund committed the tort. The plaintiffs have not sued the trustees either personally or in their representa-

tive capacity. Plaintiffs have undertaken to sue the Fund as an entity by serving process on one of the trustees.

The legal question to be answered is whether the Fund, which is a Trust, can be held liable in this action for the unlawful conduct of the trustees?

■ A Trust is a fiduciary relationship by which the trustees hold legal title to property for the benefit of others, and a suit by strangers to the trust must be brought against the trustees thereof individually and not against the fictional entity.

■ Even in cases in which the trustees, in the administration of the trust, are required to carry on business transactions and in the conduct of the business incur contractual obligations for the benefit of the trust, the trust estate can only be reached by the injured party suing the trustees in their representative capacity.

■ As a general rule, a trust fund cannot be subjected to legal liability for the torts of the trustee or his agents or employees. Wright v. Caney River Ry. Co., 151 N.C. 529, 66 S.E. 588, 589.

"The duties devolving upon a trustee as an owner of property render him personally liable for the torts committed by him or by agents and servants employed by him. The only recourse of the person injured, however, is against the trustees as individuals, it being the rule that they are not liable in their official capacity, and that the court will not allow the trust fund to be impaired by the negligence of the trustees." 39 Cyc. Trust 302.

"The duties of a trustee having the legal title to real estate, together with a right of possession as ownership, make him personally liable for torts committed by him or by the agents or servants in his employ." Schmidt v. Kellner, 307 Ill. 331, 138 N.E. 604, 606.

"An action does not lie against a trustee for his torts or those of his servants in the administration of the trust, and he must be sued individually; but the court will allow the judgment against him individually to be paid out of the trust funds, provided he was free from willful misconduct." Kellogg v. Church Charity Foundation, 128 App.Div. 214, 112 N.Y.S. 566, 567.

"Generally, trustees are not liable as such for torts in managing trust property; recourse being against them as individuals." Birdsong v. Jones, 222 Mo.App. 768, 8 S.W.2d 98.

" * * * The general rule is that the trustee is liable in his individual and not in his official capacity, and this, for the sound reason that the trustee should not be allowed, by his tort or negligence, to impair the trust fund." Louisville Trust Co. v. Morgan, 180 Ky. 609, 203 S.W. 555, 557, 7 A.L.R. 396, at page 401.

"The law will not allow trust property to be impaired or dissipated through the negligence or improvidence of trustees, or will it permit them to create any new or additional liabilities against the same. The beneficial interest thereof belongs to the cestuis, and it must be held intact for them." Parmenter v. Barstow, 22 R.I. 245, 47 A. 365, 63 L.R.A. 227; Roger Williams Nat. Bank v. Groton Mfg. Co., 16 R.I. 504, 17 A. 170.

The authorities seem to be in accord in holding that a trust estate cannot be subjected to legal liability for the torts of the trustee of his agents or servants. Ross v. Moses, 175 S.C. 355, 179 S.E. 757; Marion v. Chandler, 139 W.Va. 596, 81 S.E.2d 89, 93; Massey v. Payne, 109 W.Va. 529, 155 S.E. 658; 54 Am.Jur. Secs. 492, 493, pp. 392, 393; 90 C.J.S. Trusts § 252, p. 279. Bogert, Trusts & Trustees, Vol. I, Sec. 1, pp. 1–3; Scott on Trusts (2d Ed.), Vol. I, Sec. 2, p. 2; Restatement of the Law, Trusts, Vol. I, Sec. 2.

■ It is generally recognized that trustees are *personally* liable to third

persons for torts committed in the course of the administration of the trust to the same extent that they would be liable if they held the property free of trust. Restatement of the Law, Trusts, Vol. II, Sec. 264, p. 818. Belvin's Ex'rs v. French, 84 Va. 81, 3 S.E. 891; Patterson v. Anderson, 194 Va. 557, at page 567, 74 S.E.2d 195, page 201; Branch v. Commonwealth, 100 Va. 837, 41 S.E. 862, at page 866.

In most of the foregoing cases the Trust was exonerated from liability resulting from inadvertence, neglect, or misfeasance upon the part of the trustee. If, therefore, the Trust is not liable for the unintentional torts of the trustee, *a fortiori*, the Trust would not be liable for the tortious acts of the trustees in this case, wherein it is alleged they wilfully and purposely violated Secs. 1 and 2 of the Sherman Antitrust Act.

The Court is of the opinion and finds as a matter of law that the Fund, which is a Trust, is not liable to the plaintiffs for injuries they may have sustained resulting from the acts alleged in the complaint to have been committed by it.

The Court having decided that the Fund is a Trust and being a Trust is not liable for the torts alleged to have been committed by it, it is not necessary in the disposition of the Fund's motion to dismiss to pass upon the other questions raised in the motion with reference to the sufficiency of the process.

The Court is of the opinion that the complaint should be dismissed as to the United Mine Workers of America Welfare and Retirement Fund, and it will be so ordered.

Motion of Miners and Others to Dismiss on the Ground That the Action Was Brought in the Lynchburg Division Instead of the Abingdon Division and to Transfer It to Abingdon

All of the defendants except the Fund have moved to dismiss the complaint on the ground that this action was brought in the Lynchburg Division of this Court, instead of the Abingdon Division, where it is alleged that the cause of action arose, and they contend that the Lynchburg Division is without jurisdiction and venue.

There are no statutory Divisions in the Western Judicial District of Virginia. Virginia is divided into two Federal Judicial Districts by statute, namely, Eastern and Western Districts.

It is true that, by a Rule of Court promulgated in 1907, there has been established Divisions within the District, among which are Lynchburg and Abingdon, but these Divisions were established by the Court for the purpose of convenience in the dispatch of the business of the Court and do not affect or control the jurisdiction or venue in such cases as this. 28 U.S.C.A. Sec. 127.

If jurisdiction of a civil action exists within the Western District of Virginia, then such action may be brought in any of the Divisions within the District which have been established by Rule of Court.

The motion to dismiss will be denied.

There remains for disposition the motion to transfer the case to the Abingdon Division for trial.

The plaintiffs reside at Norton, a distance of approximately 60 miles from Abingdon and within the Abingdon-Big Stone Gap Division of this Court. Lynchburg is approximately 190 miles from Abingdon and approximately 250 miles from Norton. The cause of action is alleged to have arisen within a radius of 50 miles of Norton. It appears that the defendants expect to use approximately 50 witnesses, many of whom reside within 50 miles of Abingdon, and all of whom reside within 100 miles of Abingdon, and in most instances these witnesses could travel daily from their homes to the Court. If they were required to attend court at Lynchburg they would have to travel from 200 to 250 miles and remain there throughout the trial. To require them to do so would

**190**

cause them great inconvenience and considerable expense.

The defendants, except the Fund, have moved that the case be transferred to Abingdon. Five of counsel reside within the Abingdon Division. Two of counsel reside within the Lynchburg Division. All other counsel reside outside the District.

The Court is not unmindful that plaintiffs are entitled to great latitude in the selection of their forum; however, this does not mean that the plaintiffs can arbitrarily select a forum that would cause the witnesses and litigants great inconvenience and add substantial expense when the case could as well be tried in a forum that would eliminate much of the inconvenience and expense.

The forum closest to the plaintiffs, most of the witnesses, and to the situs of the cause of action is the Abingdon-Big Stone Gap Division of the Court. The next closest forum is in Roanoke, a distance of approximately 135 miles east of Abingdon. Lynchburg is approximately 60 miles east of Roanoke. The plaintiffs, the witnesses, and some of the attorneys would have to travel through Abingdon and through Roanoke to attend court in Lynchburg. The plaintiffs have shown no reason for bringing the action in the Lynchburg Division instead of the Abingdon Division, and no good cause why it should not be transferred to Abingdon for trial.

The Court is of the opinion that, for the convenience of the witnesses, the litigants, and in the interest of justice, the case should be transferred from the Lynchburg Division to the Abingdon-Big Stone Gap Division for trial. However, as witnesses and litigants are not ordinarily required to be present at pretrial proceedings, the Court is of the opinion to allow the case to remain on the docket at Lynchburg until such time as all pretrial proceedings have been completed, and when the case is ready for trial to transfer it to the Abingdon-Big Stone Gap Division for trial. An order will be entered accordingly.