**L. S. GOOD & COMPANY, a corporation, Plaintiff,**

v.

**H. DAROFF & SONS, INC., a corporation, Defendant.**

**Civ. A. No. 1547–W.**

United States District Court
N. D. West Virginia.
Feb. 2, 1967.

Jeremy C. McCamic, McCamic & Mc-Camic, Wheeling, W. Va., for plaintiff.

Schafer & Berardinelli, Wheeling, W. Va., Harry Norman Ball, H. Donald Busch, Philadelphia, Pa., for defendant.

## MEMORANDUM

MAXWELL, Chief Judge.

This is an action brought by L. S. Good & Company, a West Virginia corporation, against H. Daroff & Sons, Inc., a Pennsylvania corporation. L. S. Good operates a department store in Wheeling, West Virginia, and handles, among other items, men's clothing. H. Daroff & Sons, Inc., is a manufacturer and distributor of men's clothing and has its principal place of business in Philadelphia, Pennsylvania. One of Daroff's lines of men's clothing is the "Botany 500" brand of men's suits, a highly advertised and widely known brand.

L. S. Good in its complaint, filed on April 14, 1965, alleged the following:

> "The defendant has attempted to engage in and has engaged in a wrongful and unlawful combination, contract and conspiracy to: (a) prevent and restrict the selling and distribution of its products, by reason of its refusal, for the unlawful reason stated by plaintiff as aforesaid, to sell its products to the plaintiff;
>
> (b) unlawfully discriminate against a retail distributor, the plaintiff;
>
> (c) force and compel the plaintiff to cease and desist from distributing its 'Botany 500' line in favor of a competitor, the said Bernhardt's; and that such actions have unreasonably restrained, do unreasonably restrain, and will continue unreasonably to restrain trade and commerce in violation of the antitrust laws of the United States of America above cited."

The statutory provisions, referred to in the above quoted section of the complaint, are designated in the complaint as "Sections 1 through 33, inclusive, Title 15, United States Code Annotated."

The plaintiff, L. S. Good, alleges that the jurisdiction of this Court is predicated upon a question arising under the Antitrust Laws of the United States. The complaint also states that jurisdiction is "further predicated upon diversity of citizenship and an amount in controversy in excess of that prescribed."

The defendant, H. Daroff & Sons, on May 4, 1965, filed a motion to dismiss the complaint and quash the return of service of the summons on the grounds of lack of jurisdiction over the defendant, improper venue and improper service. This motion was based upon the affidavit of Samuel H. Daroff, Secretary-Treasurer of the defendant. Also, on February 8, 1966, the defendant filed a motion pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief could be granted. In addition, both parties have filed motions with regard to the taking of the depositions.

Counsel for both of the parties thoroughly briefed the questions involved in these motions and oral argument was heard in Wheeling on June 9, 1966.

This Court holds (1) that the defendant's motion to dismiss, because of improper venue and improper service, is denied, and (2) the defendant's motion to dismiss for failure to state a claim is granted, unless within 30 days the plaintiff amends its complaint so as to set forth a cause of action based on the common law. Also, the further taking of depositions by both parties is stayed.

H. Daroff & Sons, Inc., is a manufacturer and distributor of men's clothing to the retail clothing trade throughout the United States. Among its products is the "Botany 500" line of men's clothing which is well known and highly respected. For over 40 years Daroff has been selling the "Botany 500" line to Bernhardt's, a retail men's clothing store in Wheeling. In 1964, Daroff appointed L. S. Good as a retail distributor of its (Daroff's) products, including the "Botany 500" line. By a letter dated March 27, 1965, Daroff discontinued L. S. Good as a retail distributor of the "Botany 500" line, giving as its reason a prior exclusive franchise commitment to Bernhardt's.

In addition to Bernhardt's, Daroff has authorized dealers in the following cities in the Northern Judicial District of West Virginia: Wheeling (Stone & Thomas), Parkersburg (Dil's Brothers), Clarksburg (Millet & Stern), Fairmont (Maunz Men's Shop), Morgantown (J. Beafora & Sons), and Martinsburg (Stewart's).

Daroff has annual gross sales in excess of one hundred million dollars, and, although it is not entirely clear what portion of this business is done in the Northern District of West Virginia[1], the dollar volume appears to be substantial. Sidney S. Good, Jr., President of L. S. Good, in his affidavit stated that between September, 1964, and March, 1965, L. S. Good sold "approximately $20,000" worth of the defendant's products. The defendant does not dispute this figure. Assuming that each of the seven other retail outlets which Daroff has in the Northern District of West Virginia do a comparable business, this would amount to annual gross sales in excess of $225,-000. This figure is, of course, only a projection from the seven months period in which L. S. Good sold Daroff's products, but it does indicate, at least, the extent of Daroff's sales in Northern West Virginia.

Daroff employs a salesman, a Leonard Finkelhor of Pittsburgh, Pennsylvania, who makes four trips per year into West Virginia, "one trip each to take orders for the spring and fall seasons and two trips for customer goodwill purposes." Daroff contends that these orders are subject to approval in Philadelphia and, if they are approved, they are shipped FOB Philadelphia.

Daroff in its affidavit in support of its motion to dismiss the complaint states that "the defendant is not licensed to do business in West Virginia, pays no taxes in West Virginia and does not do any business in West Virginia." It further states that "the defendant has no mailing address, telephone listing or any agent within the Northern District of West Virginia."

The plaintiff, L. S. Good, obtained service of process and complaint through the Auditor of West Virginia, in accordance with the provisions of Chapter 31, Article 1, of the 1931 Code of West Virginia, as amended. The State Auditor then forwarded the process and complaint to the defendant in Philadelphia.

The pertinent provision of the West Virginia Code, § 31–1–71, Michie 1966, reads as follows:

"Any foreign corporation which shall do any business in this State without having been authorized to do so pursuant to the provisions of section seventy-nine (§ 3091) of this article shall be conclusively presumed to have appointed the auditor of the State as its attorney in fact with authority to accept service of notice and process on behalf of and upon whom service of notice and process may be made in this State for and upon every such corporation in any action or proceeding described in the next following paragraph of this section.

\* \* \* \* \* \*

"For the purposes of this section, a foreign corporation not authorized to do business in this State pursuant to the provisions of section seventy-nine (§ 3091) of this article shall nevertheless be deemed to be doing business herein if such corporation makes a contract to be performed, in whole or in part, by any party thereto, in this State, or if such corporation commits a tort in whole or in part in this State. The making of such contract or the committing of such tort shall be deemed to be the agreement of such corporation that any notice or process served upon, or accepted by, the auditor pursuant to the next preceding paragraph of this section in any action or proceeding against such corporation arising from, or growing out of, such con-

---

[1]. L. S. Good contends that it alone accounted for .002% of the defendant's annual gross sales while it was a dealer, whereas Daroff contends that its total sales in the Northern District constitute only .0015% of its annual sales.

tract or such tort shall be of the same legal force and validity as process duly served on such corporation in this State."

The Supreme Court of Appeals of West Virginia considered this section in two fairly recent cases, the more recent of which was State ex rel. Coral Pools, Inc. v. Knapp, 147 W.Va. 704, 131 S.E.2d 81 (1963). This was an original proceeding brought by an Ohio corporation seeking a writ to prohibit a Circuit Judge and the plaintiff from proceeding to trial. The Court stated the issue:

"The prohibition proceeding is based in the claim of Coral Pools, Inc., that it is not subject to the personal jurisdiction of the trial court in the civil action." 131 S.E.2d 81, 83.

In this case, the written contract to build the swimming pool was executed at Columbus, Ohio, by the appearance of the plaintiff. However,

" * * * the oral contract pertaining to the construction of a swimming pool on Kennedy's [the plaintiff] home property at Charleston was negotiated and made by a telephone conversation between Kennedy at Charleston, West Virginia, and a representative of Coral Pools, Inc., at Columbus, Ohio." 131 S.E.2d 81, 83–84.

So when faced with the question of an oral modification via long distance telephone call of a contract which had originally been made in Ohio, the Supreme Court of Appeals held:

"Inasmuch as the oral contract relating to the construction of the pool on Kennedy's property was to be performed in this state and resulted from an offer made by Onderdonk by telephone from Columbus, Ohio, to Kennedy in Charleston, West Virginia, and an acceptance by Kennedy during the course of the same telephone conversation, that contract must be deemed to have been made in this state." 131 S.E 2d 81, 86.

However, the Court went on to make this warning:

"A trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations. The amount and kind of activities which must be carried on by a foreign corporation in the state of the forum so as to make it reasonable and just to subject the corporation to the personal jurisdiction of a court in that state must be determined according to the facts and circumstances of each case." 131 S.E.2d 81, 90.

It is not clear from reading the case exactly who was to perform the installation of the pool on Kennedy's property. Coral Pools did send Kennedy "a detailed set of plans for installation of such swimming pools and a letter requesting an estimate of the cost of installation in the Charleston area." 131 S.E.2d 81, 84. Also, Kennedy performed the initial excavation and other preliminary work. So it seems to be a fair reading of the case that Coral Pools was simply going to ship the pool kit to Charleston and, at most, send one engineer to supervise the installation of the pool.

"In relation to the parol contract made by telephone, Kennedy testified that Onderdonk agreed that the corporation's engineer would be sent to Charleston to supervise the installation of the pool on his property. There is no specific denial of this portion of Kennedy's testimony." 131 S.E.2d 81, 85.

In the instant case L. S. Good stated in its answer to Daroff's interrogatories that:

" * * * defendant sent its specialist advisor on men's alteration rooms, one Joseph Parazino, to the premises of plaintiff who advised plaintiff on setting up its alternation room; that the defendant provided the plaintiff, through the said Joseph Parazino, blueprints for the layout of said alteration room; that said blueprints are signed 'Drawn by Jos. Parazino', 'approved M. Mutolese', 'A O.K. by Jos. Parazino and H. Daroff and Sons'; that the said Joe Parazino further advised on the lighting, position of racks and all other details in the planning and designing

of said alteration room; that the defendant sent the said Joseph Parazino back to the store of the plaintiff for the opening of its new men's wear department and the said Joseph Parazino advised and trained new tailors for the plaintiff, advised on fitting and assisted with the fitting during the opening of said new men's wear department, all of which services were without charge to the plaintiff; that the defendant advised the plaintiff on the advertising for the opening of said new men's wear department and contributed to its costs; * * * "

So quite apart from Daroff's other extensive contracts in the Northern District of West Virginia, it seems that its contacts with L. S. Good alone are enough to bring it within the *Coral Pools* case. The Court in *Coral Pools* construed the statutory provision of " * * * a contract to be performed, in whole or in part, by any party thereto, in this State * * " so as to include a situation which is somewhat analogous to the instant case.

Gavenda Bros. Inc. v. Elkins Limestone Company, 145 W.Va. 732, 116 S.E.2d 910 (1960), is not inapposite. There, the West Virginia Court construed an Illinois statute which authorized extraterritorial service on the defendant. The Illinois statute was considerably more comprehensive than the present West Virginia statute, involved in the instant case. "The public policy of this State, though less comprehensive in scope, is in harmony with the public policy evidenced by the Illinois statute." 116 S.E.2d 910, 916.

Speaking of the limitations imposed on the states by the due process clause of the Fourteenth Amendment, the West Virginia Court said:

"It must appear that the defendant over whom jurisdiction is asserted has had minimum contact within the state which renders it consistent with traditional notions of fair play and substantial justice that he be compelled to defend himself in that state; and assuming the existence of such requisite minimum contact, there must be a method of service which is designed to give the defendant actual and reasonable notice of the pending action against him." 116 S.E.2d 910, 916.

All of this is in accord with the guide lines laid down by the Supreme Court in International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), where the Court said:

"Historically the jurisdiction of courts to render judgments *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was a prerequisite to its rendition of a judgment personally binding him * * * But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Cases cited]" 326 U.S. 310, 316, 66 S.Ct. 154, 158.

The case of Mann v. Equitable Gas Company, 209 F.Supp. 571 (N.D.West Virginia, 1962) is not applicable here. In the *Mann* case, the Court held that a Texas corporation, that had manufactured a pipe, in Texas, and subsequently sold it to a West Virginia gas company, did not establish the necessary "minimum contact" so as to permit service of process through the State Auditor. The Texas corporation had merely sold the pipe to the West Virginia company, which subsequently used it in West Virginia where it exploded injuring the plaintiff. The only question before the Court was " * * * whether the mere commission of the tort alleged in the complaint constituted the 'minimum contacts' required by *International Shoe* * * * " 209 F.Supp. 571, 573. The Court held:

"I would construe the West Virginia statute to mean that the commission of

a tortious act within the State means that the alleged tortfeasor, or his agents were in West Virginia at the time of the act, which is alleged to have "resulted in the tort." 209 F.Supp. 571, 574.

This is in accord with the leading case in this Circuit on the question of extra-territorial service of process, Erlanger Mills, Inc. v. Cahoes Fibre Mills, 239 F.2d 502 (4th Cir. 1956), which was an action brought by a North Carolina corporation in North Carolina against a New York corporation for defective goods sold. In this case, the North Carolina corporation placed an order with the New York corporation after a visit by the North Carolina corporation's representative at the plant in New York. The goods were sold FOB at the New York plant, and the New York corporation had never done any business in North Carolina prior to this transaction. A North Carolina statute, G.S. § 55–38.1, "Jurisdiction over foreign corporation not transacting business in this State", provided:

"(a) Every foreign corporation shall be subject to suit in this State * * * on any cause of action arising as follows:

(3) Out of the production, manufacture, or distribution of goods by such corporation with the *reasonable expectation that those goods are to be used or consumed in this State and are so used and consumed*, regardless of how or where the goods were produced, manufactured, marketed, or sold or whether or not through the medium of independent contractors or dealers." (Italics supplied by the Court of Appeals.) 239 F.2d 502, 504.

The Court of Appeals held that the New York corporation was not present in North Carolina in a manner sufficient to sustain the requirement of jurisdictional due process notwithstanding the North Carolina statute.

"The problem in each case, therefore, is to determine whether or not the relationships, ties and contacts between the defendant and the state of the forum warrant jurisdiction * * *

[and] the place of execution and of performance of the contract are not alone decisive." 239 F.2d 502, 505.

■ Although the West Virginia statute has received some scholarly criticism [See 59 W.Va.L.Rev. 639 (1957) and 65 W.Va.L.Rev. 249 (1963)], this Court is of the opinion that the contacts which Daroff has had with L. S. Good and its other West Virginia distributors are of such a continuing and substantial nature that it does not offend the requirements of jurisdictional due process to hold Daroff accountable for its actions in West Virginia.

The recent decision of the West Virginia Supreme Court of Appeals in Tufe Hodge v. Sands Manufacturing Company, W.Va., 150 S.E.2d 793 (1966), is distinguishable from the case at bar. In *Tufe Hodge*, the plaintiff employed a plumbing contractor to do certain work which included the installation of an electric hot water heater on the plaintiff's premises. The defendant, Sands Manufacturing Company, sold the allegedly defective hot water heater to a dealer in Huntington, West Virginia, who in turn sold it to the plaintiff, Tufe Hodge. The other defendant, Therm-O-Disc, had sold two thermostats to the Sands Manufacturing Company which were installed in the hot water heater.

The Court in deciding this case did not give any indication as to the amount of business which these two defendant corporations did in the state of West Virginia. In its holding the Court stated that neither of the defendants had "engaged in any persistent course of conduct in selling such heaters to purchasers or engaged in other transactions in this State * * *" So the factual situation in *Tufe Hodge* seems to be quite similar to that in Mann v. Equitable Gas Co., supra, where an isolated business transaction between the resident plaintiff and the non-resident defendant corporation which led to the plaintiff's injury was held not to establish the necessary minimum contacts to confer jurisdiction upon the court under the applicable statute,

West Virginia Code, § 31–1–71 (Michie, 1966).

The Supreme Court of Appeals of West Virginia in its decision also laid great stress on the fact that the allegedly defective hot water heater was not sold directly to Tufe Hodge but was sold to the Huntington dealer, who sold it to Tufe Hodge. This, of course, serves to distinguish *Tufe Hodge* from the case at bar.

Perhaps much of the foregoing is unimportant, in that the venue and service of process requirements are much easier to meet in antitrust suits than they are in the normal, ordinary civil case. However, the plaintiff in this case chose to utilize the procedure afforded it by the West Virginia statute and in light of the Court's decision on the motion to dismiss, for failure to state a cause of action, infra, the question of personal jurisdiction over the defendant can be raised. Now, however, that question is determined.

■ Rule 4(d) (3) of the Federal Rules of Civil Procedure provides that personal service shall be made upon a foreign corporation by delivering a copy of the summons and the complaint to, among others, " * * * any other agent authorized by appointment or by law to receive service of process * *." Also Rule 4(d) (7) provides that on a foreign corporation it is sufficient if the summons and complaint are served " * * * in the manner prescribed by the law of the state in which the district court is held * * *" So the plaintiff's actions were completely in accordance with the Federal Rules of Civil Procedure, and all of the requirements for personal jurisdiction over the defendant have been met.

■ The United States District Courts are given jurisdiction over private antitrust actions by 15 U.S.C.A. § 15 which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy * * *."

Federal jurisdiction is exclusive here. See e. g. Englehardt v. Bell & Howell Co., 327 F.2d 30 (8th Cir. 1964).

■ This rule has been liberalized in the case of corporate defendants by 15 U.S.C.A. § 22 which reads:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business * * *."

One purpose of liberalizing the requirements, when corporate defendants are concerned, was to "increase the number of districts in which a corporation might be sued for violation of the antitrust laws." American Football League v. National Football League, 27 F.R.D. 264, 267 (D.Md. 1961). See also Goldlawr, Inc. v. Shubert, 169 F.Supp. 677 (Pa. 1958), and Cinema Amusements v. Loew's, Inc., 85 F.Supp. 319 (Del.1949).

■ An ancillary purpose of the expanded venue provision was to "relieve persons injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due." United States v. Scophony Corp. of America, 333 U.S. 795, 808, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948).

The question of venue and service of process in the instant case seems to be controlled by the decision in Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), which arose shortly after Congress inserted the additional words "or

transacts business" after the original phrase "may be found." Eastman Kodak, the plaintiff-in-error, which was represented by John W. Davis, argued that the phrase "or transacts business" was not intended to broaden the scope of the section but was meant only "to make explicit what the Court had already decided". 273 U.S. 359, 361, 47 S.Ct. 400.

The Court was faced with a factual situation which, with regard to the question of proper venue, was weaker than presented by the instant case.

" * * * the defendant—which resides and has its principal place of business in New York—had not registered in Georgia as a non-resident corporation for the purpose of doing business in that State, and had no office, place of business or resident agent therein. It had, however, for many years prior to the institution of the suit, in a continuous course of business, carried on interstate trade with a large number of photographic dealers in Atlanta and other places in Georgia, to whom it sold and shipped photographic materials from New York. A large part of this business was obtained through its traveling salesmen who visited Georgia several times in each year and solicited orders from these dealers, which were transmitted to its New York offices for acceptance or rejection. In furtherance of its business and to increase the demand for its goods, it also employed traveling 'demonstrators,' who visited Georgia several times in each year, for the purpose of exhibiting and explaining the superiority of its goods to photographers and other users of photographic materials. And, although these demonstrators did not solicit orders for the defendant's goods, they took at times retail orders for them from such users, which they turned over to the local dealers supplied by the defendant." 273 U.S. 359, 370–371, 47 S.Ct. 400, 402.

The question before the Court was " * * * whether there was local jurisdiction or venue in the District Court".

273 U.S. 359, 370, 47 S.Ct. 400, 402. The Court said that by the amendment " * * * the local jurisdiction of the district courts was materially enlarged in reference to suits against corporations." 273 U.S. 359, 372, 47 S.Ct. 400, 403. As for the construction of the phrase "transacts business," the Court held:

" * * * a corporation is engaged in transacting business in a district, within the meaning of this section, in such sense as to establish the venue of a suit—although not present by agents carrying on business of such character and in such manner that it is 'found' therein and is amenable to local process,—if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character." 273 U.S. 359, 373, 47 S.Ct. 400, 403.

█ It is the opinion of this Court that the instant case falls squarely within the *Eastman Kodak* guidelines, with regard to the venue requirements of the antitrust aspects of the case.

A reading of United States v. Scophony Corporation of America, supra, further illustrates the appropriateness of the Northern District of West Virginia as the proper venue for this type of antitrust suit. In *Scophony* the District Court quashed the service of process and dismissed the complaint as to a British corporation which had its principal place of business in London. The facts of this case are set out in the syllabus at 333 U.S. 795, 68 S.Ct. 855:

"A British corporation with its principal place of business in London engaged in the Southern District of New York in various but continuing efforts to conserve and exploit its television inventions and patents. This was done through a series of complex contractual arrangements made with certain American corporations and involved the British company's constant intervention and supervision. The company was represented in the New York district by two of its directors, one of whom held a comprehensive power

of attorney to protect its interests in the United States."

Justice Rutledge began the Court's opinion with a review of the historical changes in the venue provisions in the antitrust laws. He concluded by saying:

"Thus, by substituting practical, business conceptions for the previous hair-splitting legal technicalities encrusted upon the 'found'-'present'-'carrying-on-business' sequence, the Court yielded to and made effective Congress' remedial purpose. Thereby it relieved persons injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the places of their business or residence." 333 U.S. 795, 808, 68 S.Ct. 855, 862.

In the case of Yonce v. Miners' Memorial Hospital Association, et al., 161 F.Supp. 178 (Va.1958), an action was brought by certain laundry owners against the hospital association and a firm of laundry consultants alleging an unlawful combination and conspiracy in violation of the Sherman Act to restrain and monopolize the commercial laundry service in a particular area.

The laundry consultants, Victor Kramer Co., Inc., a New York corporation, spent approximately two weeks in Virginia, West Virginia and Kentucky, before it entered into an agreement of indefinite duration to serve as laundry management consultants for the hospitals. Process was served on Kramer through the Secretary of the Commonwealth of Virginia, in accordance with § 13–217 of the Code of Virginia of 1950, as amended. Judge Thompson, after stating the facts of the case, said " * * * if Kramer was doing business in the Western District of Virginia it is amenable to process served on it through the Secretary of the Commonwealth * * *." He went on to point out that the question of doing business is one of fact and must be determined according to the factual situation of each case.

"If a corporation is engaged in promoting or carrying out a substantial amount of its corporate business in a foreign state, it is engaged in transacting business in that state * * * The business activities of Kramer in Virginia are the same activities—the substantive acts—upon which the plaintiff bases its antitrust allegation against Kramer. If Kramer in the conduct of its business in Virginia has violated the antitrust law, then it is amenable to the process of this Court." 161 F.Supp. 178, 184.

In the instant case, it is also the business activities of Daroff in the Northern District of West Virginia, which are the basis of L. S. Good's complaint, that make it amenable to process and complaint served upon the State Auditor of West Virginia.

■ Daroff's other motion is to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. As the defendant states in its brief, for the purposes of this motion, all well-pleaded allegations of fact must be deemed to be admitted and the plaintiff is entitled to the benefit of all reasonable inferences therefrom. The pertinent allegations of the complaint are as follows:

"Plaintiff, in the spring and summer of 1964, enlarged and remodeled its place of business * * * and added a large and well equipped men's clothing department. Defendant gave great assistance to the plaintiff in the planning and organization of this department and helped install its said 'Botany 500' line of men's clothing and plaintiff used the said promotional materials sent and in addition expended large sums on its own promotion of the said 'Botany 500' line including statement enclosures, newspaper advertising, extensive radio and television advertising, roadside billboards, and concentrated sales effort in the said men's clothing department of plaintiff."

The plaintiff also alleges in its complaint:

"Prior to March 27, 1965, the plaintiff had been appointed and had acted as a retail distributor of defendant's products including that line of men's clothing products of the defendant well known and highly respected as the 'Botany 500' line.

By letter of March 27, 1965, defendant through its president, Joseph Daroff, discontinued plaintiff as a retail distributor of the defendant's products with the 'Botany 500' label. The reason given was as follows:

We have been selling Bernhardt's in this city for over 40 years and when we inaugurated the 'Botany 500' line the account was handled by my brother Michael, who made a definite commitment to them that they would have the exclusive franchise thereafter.

The aforesaid Bernhardt's is a retail men's clothing store also located in Wheeling, Ohio County, West Virginia."

By reason of the above, plaintiff claims injury to its business and property in an amount in excess of $100,000, and demands treble damages, costs and reasonable attorney's fee.

The complaint shows a situation where a manufacturer (that is also a distributor) of men's clothing has chosen to favor one retailer over another as an outlet for *one line* of the manufacturer's products. There is no allegation, nor is there any indication, that this refusal to deal was a product of anything other than an exercise of Daroff's business judgment. Bernhardt's also operates a store in Rockford, Illinois, but there is no allegation that the purchasing "leverage" from this store was used to influence the decision as to which retail outlets Daroff would use in Wheeling. In short, there is no allegation of a contract, combination or conspiracy which would run afoul of the antitrust laws. Also, there is no allegation that Daroff refused to sell any other of its many lines to L. S. Good. In answer to Daroff's Interrogatory 4(B) ("Set forth * * the name and address of the manufacturer, producer, or wholesaler of each such article of men's clothing."), L. S. Good lists six firms whose merchandise it carries, in addition to the defendant. So it appears that the market foreclosure incurred by Daroff's refusal to sell is a rather insubstantial one.

The sole issue before the Court is whether a cause of action exists under the antitrust laws. The complaint does not designate which section of the antitrust laws is alleged to be violated. The defendant suggests that under no section could the plaintiff plead a valid cause of action. The antitrust laws of the United States are set out in the Sherman Antitrust Act (15 U.S.C.A. §§ 1–7), the Clayton Antitrust Act[2] (15 U.S.C.A. §§ 12–27), and the Robinson-Patman Act (15 U.S.C.A. §§ 13–13c, 21a).[3]

The only possibly relevant sections of the antitrust laws are Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2) which prohibit, respectively, "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce * * *" and "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * *." Sections 4 and 12 of the Clayton Act (15 U.S.C.A. §§ 15 and 22) authorize private suits by persons in-

---

2. Section 3 of the Clayton Act (15 U.S.C.A. § 14) *makes illegal any lease or sale of goods on the condition that the purchaser will not use or deal in the goods of a competitor where the same may substantially lessen competition or tend to create a monopoly. This section has no relevance to instant case.*

3. The Robinson-Patman Act which amended the Sherman-Clayton Acts, prohibits discrimination in price, services or facilities among customers. The complaint in the instant case does not suggest such violations.

jured because of violations of the anti-trust laws.

■ The basis of the complaint, as noted above, is the refusal of the defendant to continue to sell its "Botany 500" line to the plaintiff. The complaint does charge the defendant with engaging in a "combination, contract and conspiracy," but no supporting facts have been alleged. A conclusory allegation of this type does not set forth a cause of action. Glenn Coal Co. v. Dickinson Fuel Co., 72 F.2d 885, 888 (4th Cir. 1934); Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 148 A.L.R. 841 (3rd Cir. 1941), cert. den. 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539.

The case which most nearly resembles the instant case is Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S. App.D.C. 161, 243 F.2d 418 (1957), rev'g 135 F.Supp. 4 (D.D.C.1955), cert. den. 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38, rehearing denied 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 197. In this case, Zell Motor Car Company, the largest of Packard's three Baltimore dealers, told Packard that Zell was losing money and would quit unless Packard gave it an exclusive distributorship. Packard agreed to do so and told its two other Baltimore dealers that their contracts would not be renewed. The District Court submitted to the jury the question " * * * whether there was an unreasonable restraint of trade and also whether there was an agreement or attempt to monopolize." The Court of Appeals entered judgment for the defendant (Judge Bazelon dissenting).

"There was no contract or conspiracy in restraint of trade within the meaning of the Sherman Act. As the Court informed the jury, it has long been clear that only unreasonable restraints of trade are unlawful. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. When an exclusive dealership 'is not part and parcel of a scheme to monopolize and effective competition exists at both the seller and buyer levels, the arrangement has invariably been upheld as a reasonable restraint of trade. In short, the rule was virtually one of *per se* legality' until the District Court decided the present case. * * The fact that any other dealers in the same product of the same manufacturer are eliminated does not make an exclusive dealership illegal; it is the essential nature of the arrangement. The fact that Zell asked for the arrangement does not make it illegal. Since the immediate object of an exclusive dealership is to protect the dealer from competition in the manufacturer's product, it is likely to be the dealer who asks for it.

The short of it is that a relatively small manufacturer, competing with large manufacturers, thought it advantageous to retain its largest dealer in Baltimore, and could not do so without agreeing to drop its other Baltimore dealers. To penalize the small manufacturer for competing in this way not only fails to promote the policy of the antitrust laws but defeats it." 243 F.2d 418, 420–421.

The situation in the men's clothing industry is quite similar to the situation described in the *Packard Motor Car* case. Daroff, despite its large annual gross sales, is only one of a large number of manufacturers, each with only a small share of the market.[4] Therefore, it is hardly conceivable that Daroff's refusal to sell in this case could constitute an attempt to monopolize.

That such a refusal to sell by a manufacturer is not an unreasonable restraint of trade can clearly be seen from the

---

4. The 1963 United States Census of Manufacturers, Series MC63 (P–23a–1) shows that there are some 1105 manufacturing establishments of men's and boys' suits and coats. The Statistical Abstract of the United States—1965, p. 776, Table 1125, shows the net total selling value of men's and boys' suits and coats in 1963 was in excess of 1½ billion dollars.

fact that the Clayton Act specifically provides (15 U.S.C.A. § 13(a)):

"* * * *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade * * *."

The Courts of this Circuit have followed the holdings affirming a manufacturer's freedom to refuse to deal with any particular customer. In Miller Motors, Inc. v. Ford Motor Co., 252 F.2d 441 (4th Cir. 1958), the Court held that an automobile manufacturer's collection of contributions to a dealer's advertising association, by including assessments in the price of the new cars delivered to the dealers, did not violate the Sherman Act:

"The hybrid nature of a private antitrust suit dictates that, to succeed, the plaintiff must prove not only that the defendant has infringed one or more of the antitrust laws to the public injury, but also that such infringement has resulted in private injury to the plaintiff in its business or property. 15 U.S.C.A., Sec. 15. In the absence of a showing of either the public or private harm, the plaintiff cannot prevail." 252 F.2d 441, 443.

In Glenn Coal Co. v. Dickinson Fuel Co., supra, the Court said:

"In a civil suit under this section, the gist of the action is not merely the unlawful conspiracy or monopolization or attempt to monopolize interstate commerce in the particular subject matter, but is damage to the individual plaintiff resulting proximately from the acts of the defendant which constitute a violation of the law. A mere conspiracy with intent to violate the law while it may be the basis of a valid indictment under the criminal sanctions of the Anti-trust Act, does not give rise to a personal civil suit for damages." 72 F.2d 885, 887.

And in the instant case, the plaintiff, L. S. Good, has simply not met these requirements.

■ Even if Daroff had discontinued selling to L. S. Good in furtherance of a scheme to maintain resale prices (there is no indication of this in the complaint, but the very barrenness of that document forces one to search for possible theories of recovery), this alone would not be enough to afford a basis for denying Daroff's motion to dismiss. The law in this area—resale price maintenance backed up with a refusal to deal—is not altogether clear, but this complaint does not allege enough to even come within that vagueness. The original rule which was laid down in United States v. Colgate & Co., 250 U.S. 500, 39 S.Ct. 465, 63 L.Ed. 992 (1919) was:

"In the absence of any intent to create or maintain a monopoly, the Sherman Act does not prevent a manufacturer engaged in a private business from announcing in advance the prices at which his goods may be resold and refusing to deal with wholesalers and retailers who do not conform to such prices." Syllabus, 250 U.S. 300, 301, 39 S.Ct. 465.

However, this exception to the antitrust laws has been so narrowed that Justice Harlan in his dissent in United States v. Parke, Davis & Co., 362 U.S. 29, 49, 80 S.Ct. 503, 4 L.Ed.2d 505, said:

"Scrutiny of the opinion will reveal that the Court has done no less than send to its demise the *Colgate* doctrine * * *."

*Parke, Davis,* a civil suit under § 4 of the Sherman Act, charged a drug manufacturer with combining and conspiring to maintain the resale prices of its products in areas where, unlike West Virginia,[5] there were no Fair Trade laws. However, the first proviso to Section 1 of the Sherman Act (15 U.S.C.A. § 1) which was added by Act of Congress August 17, 1937, makes this type of agreement legal in states such as West Virginia.

5. West Virginia Code, § 47–11–1 to 47–11–8 (Michie 1966).

"*Provided,* That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale * * * "

The second proviso to Section 1 prohibits any contract or agreement between manufacturers or between retailers (and certain other classes not applicable here), "providing for the establishment or maintenance of minimum resale prices * * * " However, this issue is not raised by the complaint.

■ However, a manufacturer's or a distributor's discretion as to whom it will sell is not unlimited. If the refusal to deal is a device used to acquire a monopoly, United States v. General Motors Corporation, 121 F.2d 376 (7th Cir. 1941); or to fix prices, FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); or to establish market dominance and drive out competitors, Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); or as part of a boycott, Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); it would be illegal. These are *per se* violations—restraints which are inherently bad, and any contract, combination or conspiracy used to accomplish such a result is unreasonable and is therefore prohibited.

None of the above are alleged in this case. All that is alleged is that defendant refused to sell to plaintiff and sold to plaintiff's competitor. And this, under all of the cases, is perfectly legal and proper. As the Honorable Archie O. Dawson stated at the *Seminar* on Protracted Cases, 23 F.R.D. 430, 431:

"The filing of a complaint in a federal court is, in effect, a license to the plaintiff to subject the defendant to the expense and difficulties of extensive discovery proceedings. The least that can be expected is that the plaintiff, as a condition of getting this license, should be able to set forth in a complaint a short and plain statement of the plaintiff's claim against the defendant, showing that the plaintiff is entitled to relief against the defendant."

■ The complaint in this action does not show any conspiracy or unreasonable restraint of interstate commerce, nor any monopoly forbidden by the antitrust laws, nor any other allegations sufficient to support an action for treble damages.

■ However, since the Court has decided that the defendant is properly before it, regardless of the nature of the action, and the plaintiff has alleged the requisite diversity of citizenship, leave will be granted to the plaintiff to amend its complaint so as to set forth a cause of action based on the common law. See Arthur v. Kraft-Phenix Cheese Corp., 26 F.Supp. 824, 826 (D.C. Md. 1938). If the plaintiff fails to allege a common law cause of action within 30 days from the date of the entry of this opinion, then the complaint will be dismissed for failure to state a claim upon which relief can be granted. Also, in event plaintiff attempts to allege a common law cause of action, the requisite jurisdictional amount must be alleged in the new complaint. As Judge Chesnut said in Arthur v. Kraft-Phenix Cheese Corp., supra:

"It is not generally desirable to decide cases of doubtful import on the pleadings only as by demurrer. But suits of this character involving alleged

conspiracies to monopolize or restrain trade often lead to very protracted trials and it is not reasonable to subject either or both parties to the expense of a long trial when it fairly appears with reasonable clarity from the declaration that conceding all of the facts therein well pleaded, there would have to be a directed verdict against the plaintiff * * *." 26 F.Supp. 824, 830.

An order will be entered denying defendant's motion to dismiss because of improper venue and improper service; and granting defendant's motion to dismiss for failure of the complaint to state a claim, unless within 30 days of the date of this opinion the plaintiff amends its complaint to set forth a common law cause of action.