Emma SANDER, Individually and as Administrator W/W/A of the Estate of Ernest J. Sander, Deceased, original Plaintiff, Phillip S. Makin, substitute Plaintiff, Plaintiff,

v.

John and Rose KRISTOF, Defendants.

No. HS-71-C-19.

United States District Court,
W. D. Arkansas,
Hot Springs Division.

Oct. 18, 1972.

Dan McCraw, Hot Springs, Ark., Phillip S. Makin, Chicago, Ill., for plaintiff.

Ted G. Boswell, of Cockrill, Laser, McGehee, Sharp & Boswell, Little Rock, Ark., for defendants.

## OPINION

JOHN E. MILLER, Senior District Judge.

Because of the issues involved and the manner in which the trial was conducted, the court, in an effort to clarify the issues and to promote an understanding of them, will in the first few pages of this opinion state certain uncontroverted background facts.

Mr. Ernest J. Sander and his wife, Emma, resided at Wilkerton, Indiana. He was a fairly successful businessman, and they had for years been traveling from the latter part of December until the succeeding April. They had been guests on at least one other occasion of the Central Motel operated by the defendants, and on Thursday afternoon, January 8, 1970, they again appeared on their usual annual visit and specifically requested that they be assigned to Room 21, which they had occupied on their prior visit. Mr. Sander was suffering from what appeared to be a rather severe cold, and after he registered and the room was assigned, he took a thermal bath in one of the many independent bath houses in Hot Springs.

Room 21 was a standard kitchen-type unit. In addition to a gas stove in the kitchen area, room heat was provided by a vented tube-type heating unit in the sleeping area. There was an unvented "drum heater" located in the bathroom. Both of these units were operated by natural gas. There were workable window units in both the sleeping area and the bathroom area.

On Saturday morning, January 10, 1970, the defendant Mrs. Kristof was requested by Mr. Sander to call a doctor as both Mr. and Mrs. Sander were ill and too weak to go to a doctor's office. Dr. Jack Wright responded to the call and diagnosed Mr. Sander's illness as an

acute upper respiratory infection and possible pneumonia. Mr. Sander was given a penicillen injection and a prescription for Tussagesic, a medicine for congestion and coughing. Mrs. Sander was also given this prescription.

On Sunday, January 11, Mr. Kristof put the morning paper in the screen door of Room 21. He returned later and observed the paper was still there and knocked on the door. Mrs. Sander advised him through the door that they didn't need anything and to just leave the paper in the door.

If Mr. and Mrs. Sander left the room after Dr. Wright visited them on Saturday, January 10, they were not seen by either Mr. or Mrs. Kristof until Monday morning, January 12. However, the maid cleaned the room on Saturday and found the room was dirty and everything was strewn around like it was on Monday morning, January 12. On that morning the maid had attempted to get into the room to clean it but had gotten no answer when she knocked on the door. Thereupon Mr. Kristof attempted to contact Mr. and Mrs. Sander by voice but failed, and then he and Mrs. Kristof accompanied by the maid entered the room. Mr. Sander was unconscious and Mrs. Sander was only semi-conscious. They were taken to Ouachita Memorial Hospital and treated for carbon monoxide poisoning. Mr. Sander died on January 16 without regaining consciousness. Mrs. Sander's condition improved from the time of admission to the hospital, and on January 18 she was released from the hospital to go home with relatives.

On September 27, 1971, this suit was filed by Emma Sander as Administrator of the Estate of Ernest Sander, deceased, to recover damages for the death of her husband on behalf of his estate and individually for damages suffered by her as a result of carbon monoxide poisoning while a registered guest in Room 21 of the Central Motel. She asked for damages on behalf of the estate in the sum of $5,000 medical and burial expenses, $20,000 conscious pain and suffering by Mr. Sander before his

death, $50,000 in earnings which Mr. Sander could have earned during the remainder of his lifetime, and $50,000 in other damages. Also, it was alleged that the heirs at law of Mr. Sander had been damaged in the sum of $50,000 by reason of mental anguish, grief, loss of services and support, because of the death of Mr. Sander. Individually, Mrs. Sander asked for $2,000 in medical expenses incurred or which will be incurred, $50,000 for pain, suffering and mental anguish, and $50,000 for permanent loss of earning capacity.

In the complaint it is alleged that the defendants were negligent in that they:

"a. had installed, or caused to be installed, faulty heating equipment in Room Number 21 of the said Central Motel, or heating equipment which would not properly allow for the venting or removal of carbon monoxide gas from the said motel room, and

b. failed to warn the plaintiff or her late husband as to the dangers present in the said room from carbon monoxide poisoning, and

c. failed to provide reasonable safe facilities for guests of their motel."

It was further alleged that the defendants' duty as innkeepers to their guests, Mr. and Mrs. Sander, was to provide a safe facility for use by their guests.

Plaintiff is seeking to recover damages in the amount of $277,000.

The defendants denied any negligence by them and affirmatively alleged that any injuries sustained by Mr. and Mrs. Sander were caused by (1) contributory negligence on the part of either or both, (2) that the Sanders did not use the premises for the purpose or manner intended by their occupancy, and (3) that their use or occupancy of the premises or fixtures was not in the manner for which the premises or fixtures were constructed or maintained.

An amended complaint was filed by the plaintiff on April 3, 1972, in which

it was alleged that the bathroom heating unit in Room 21 was not vented pursuant to Ark.Stat.Ann., § 71–1118 (1957 Repl.), and that the violation of this statute was intentional and wilful. Plaintiff prayed for punitive damage in the amount of $50,000 in addition to previous damages claimed.

The defendants in their answer denied the allegations of the amended complaint.

On April 19, 1972, the plaintiff filed a motion in which she alleged that subsequent to January 12, 1970, a heating instrument was removed from the said premises by Grover Dunn, expert witness, residing in Atlanta, Georgia, and employed by the defendants; that the said heating apparatus was in possession of Mr. Dunn and that in order to make a scientific test of the defendants' premises and operation of the heating apparatus, it was necessary that the original heater be used and inspected by the plaintiff's expert witnesses.

That part of the motion to require that the heating apparatus be returned and installed in the room for the purpose of testing was objected to by the defendants, although they had no objection to the plaintiff's expert witnesses testing the heating instrument which at that time was in the laboratory of Grover Dunn. The grounds for the objection was that the lapse of time from the date of the alleged injury, together with certain other variations, would reduce or alter the validity of any tests made by the reinstallation of the apparatus and its test in the room. However, the court on May 16, 1972, granted the motion of the plaintiff, and in accordance with the order of the court the instrument or heater for the bathroom was returned and reinstalled, and an inspection duly made which will be more fully referred to hereinafter in the consideration of the facts.

On the second day of the trial, July 27, the plaintiff, through her attorneys, Mr. Dan McCraw and Mr. Phillip S. Makin, and the defendants, through their attorney, Mr. Ted Boswell, appeared in chambers, and counsel for plaintiff stated that plaintiff, Emma Sander, has become incompetent and unable to proceed as a party plaintiff. They orally moved the court to substitute Mr. Makin, a citizen of Illinois and a resident of Chicago, as a party plaintiff. Mr. Makin moved to withdraw as counsel for the trial of the cause in order that he might be substituted as a party plaintiff. The defendants objected to the substitution of Mr. Makin as a party plaintiff, which objection was overruled, and Mr. Makin was permitted to withdraw as counsel and be substituted as a party plaintiff under Rule 25(b), Fed.R.Civ.P.

The case was tried to the court on July 26–28, 1972.

The original plaintiff, Emma Sander, is a citizen and resident of the State of Indiana, and is the duly appointed and acting Administrator with will annexed of the Estate of Ernest J. Sander, deceased.

The defendants are citizens of Arkansas and reside in the City of Hot Springs.

The amount in controversy exceeds $10,000, exclusive of interest and costs. Jurisdiction of the court is granted by 28 U.S.C.A., § 1332(a).

The rights of the parties are determined by the applicable substantive law of Arkansas.

In view of the allegations contained in the complaint of the plaintiff and the amendment thereto, together with the defenses alleged by defendants in their answer and the contentions of the parties on the briefs submitted by them, the court believes that a statement of the applicable law should be set forth before making a further statement of the facts as established by the evidence.

### The Applicable Law

In 40 Am.Jur.2d, Hotels, Motels, Etc., page 941, § 61, it is stated:

"After a guest has been assigned a room at an inn or hotel for his exclu-

sive use, he has a right of occupation for all lawful purposes until it is vacated, subject only to the right of the innkeeper or his servants to enter the room at reasonable times and in the proper manner and for such purposes as might be necessary in the general management of the hotel, or upon the happening of some unanticipated emergency."

At page 978, § 105, the rule is stated as follows:

"An innkeeper is liable for injuries to guests resulting from a defective or dangerous condition of heating or lighting appliances or fixtures where he has failed to use reasonable or ordinary care in the installation or maintenance of the same. The duty of an innkeeper to exercise ordinary care in providing a safe gas heater has been held to have been violated where hotel guests were killed by carbon monoxide gas produced by a defective gas heater and such condition of the heater was known to the innkeeper. Of course, contributory negligence on the part of the guest bars recovery against the innkeeper."

In the case of Ford v. Adams (1947), 212 Ark. 458, 206 S.W.2d 970, 207 S.W. 2d 311, three separate causes of action were consolidated and tried together. Verdicts were rendered in the three cases totaling $65,000. One of the causes was the suit by Adams for the loss of consortium of his wife who died as a result of burns suffered by her. Another cause was by the Administrator of Mrs. Adams' estate for her pain and suffering, and the third cause of action was by Adams for compensation for pain, suffering and diminution of his earning capacity on account of the alleged negligent failure of the hotel to have adequate fire escapes.

Adams and his wife were registered guests at the Great Northern Hotel in Hot Springs, Arkansas, on November 13, 1946, and had been assigned to Room 352 which was located on the top or third floor of the hotel. There were 73 bedrooms in the hotel, of which 37 were on the third floor, the others being on the second floor. Another guest had been assigned to Room 350 on the third floor. There was no contention that the hotel was in any manner responsible for the origin of the fire. The guest in Room 350 was evidently drunk and continued to smoke after retiring.

Ark.Stat.Ann., § 71–1117, formerly § 7201, Pope's Digest, was in force at the time the hotel was destroyed by fire and the statute provided that it was the duty of every person operating any hotel or inn containing seven rooms or more, two stories high or more, to have a rope not less than ½ inch in diameter and knotted not more than 15 inches apart. and of sufficient strength to hold up five hundred pounds and long enough to extend within 24 inches of the ground, and any operator of a hotel failing to comply with the Act, shall be guilty of a misdemeanor and on conviction shall be fined not less than $10.00 or more than $50.00 or imprisonment for a term not exceeding 30 days. The hotel was not equipped with the ropes as required by the statute.

The court reversed the trial court, and beginning at page 462 of 212 Ark., at page 972 of 206 S.W.2d said:

"One instruction told the jury upon what findings they might hold appellants negligent, which of course means liable, and a second instruction told the jury to find for plaintiff if it were found that defendants were negligent as defined in the other instructions.

"The chief insistence for the affirmance of the judgment is that ropes were not supplied in the various rooms as sec. 7201, Pope's Digest requires, if fire escapes were not provided. The complaint did not allege that it was negligence to have provided only one fire escape from the third floor. Had that allegation been made, issue could have been joined as to whether ordinary care would have required more than one fire escape in

view of the facilities furnished for that purpose, to-wit, three stairways, one elevator and one fire escape leading from the third floor. On the contrary, without that allegation, the jury was directed to find whether that failure was negligence.

"The instruction number one in effect directed a verdict for the plaintiff, as it authorized the finding of negligence 'if suitable and workable methods were not furnished for the exit of persons renting rooms on the west side of the third floor of the building, in case of fire.' Many objections were offered to this instruction. It permits the jury to view this fire and the injuries resulting from it retrospectively and not prospectively. If this were the proper or permissible test of negligence there would be liability for nearly all injuries as most of them could have been averted if something had not been done which was done, or something was left undone which might have been done. It is a trite saying that hind sights are better than fore sights. Inasmuch as the owners and the lessee of the hotel were not insurers of the safety of their guest, liability must be determined by the answer to the question 'Did they furnish the facilities for the safety of their guests which ordinary care required and reasonable prudence would have suggested?' If they did not they were negligent. If they did they were not negligent, although it may now appear that some 'suitable and workable method' might have been employed which was not employed."

At page 466, 206 S.W.2d at page 974 the court said:

"We interpret the instructions given as making the appellants insurers of the safety of their guests inasmuch as it now appears that precautions might have been taken, which if taken would have enabled all guests to escape from the burning building, whereas the question which should have been submitted to the jury is, as has been stated, whether all the precautions had been taken which reasonable prudence and ordinary care would have suggested, these being the stairways leading from the third to the second floor, an elevator, and one fire escape. The jury might have found that these facilities for escape did not meet the requirements of due care, but that question should have been submitted without permitting the jury to impose precautions which might have transcended ordinary care. Baker v. Dallas Hotel Co., 5 Cir., 73 F.2d 825; Louisville Trust Co. v. Morgan, 180 Ky. 609, 203 S.W. 555, 7 A.L.R. 396; West v. Spratling, 204 Ala. 478, 86 So. 32; Thomas v. Wollcott, Sup., 180 N.Y.S. 798."

Newell v. Arlington Hotel Co. (1952), 221 Ark. 215, 252 S.W.2d 611, was a case where the appellant as plaintiff alleged that while a guest at the defendant hotel, she fell into the hotel kitchen and sustained injuries for which she suffered damages. There was a verdict for the defendant. In the trial of the case the court gave the instruction set forth at page 221 of 221 Ark. at page 614 of 252 S.W.2d:

" 'You are instructed that the defendant, Arlington Hotel Company, is not an insurer of the safety of its guests, but is required only to use ordinary and reasonable care for the safety of such persons; and if you find from the evidence in this case that the Arlington Hotel Company used ordinary and reasonable care for the safety of the plaintiff, then your verdict will be for the defendant, Arlington Hotel Company.' "

The plaintiff's objections to the instruction were as follows:

" 'Plaintiff objects to defendant's requested instruction No. 2 for the reason that it is abstract and does not state the whole law of this case in the respect of the care required of the Arlington Hotel. It is true that the hotel company is not the insurer of the safety of the guests, but there is an

implied contract between the guest of the hotel and the operators of the hotel that the premises are safe and it is not required of plaintiff to make any extra investigation or as to condition; that they have a right to rely upon the places where they go as a guest to be safe.' "

The court held that the questioned instruction was good against the objections urged against it, and on page 222 of 221 Ark., on page 615 of 252 S.W.2d said:

"(b) the Instruction fully and correctly states the applicable rule of law as to the degree of care required of the Hotel. In Ford v. Adams, 212 Ark. 458, 206 S.W.2d 970, 973, 207 S. W.2d 311, in discussing the degree of care that a Hotel owed to its guests, we said:

" 'Inasmuch as the owners and the lessee of the hotel were not insurers of the safety of their guests, liability must be determined by the answer to the question "Did they furnish the facilities for the safety of their guests which ordinary care required and reasonable prudence would have suggested?" . . . If they did they were not negligent, although it may now appear that some "suitable and workable method" might have been employed which was not employed.'

"In Trulock v. Willey, [8 Cir.,] 187 F. 956, 960, the Appellate Court approved the Instruction that the trial court gave to the jury:

" 'A keeper of a hotel is not an insurer of the safety of his guests. The limit of his duty is to exercise reasonable care for the safety and comfort of his guests, * * * ' "

Early v. John A. Cooper Company (W.D.Ark.1969), 304 F.Supp. 906, was a diversity action for injuries allegedly sustained by plaintiff in a fall in a bath tub provided for her use by the defendant motel. The trial court found for the defendant, and in deciding the case said at page 909:

"The court is compelled to hold that persons of ordinary intelligence and common experience are familiar with the ordinary manner in which bathmats are used and that the bathmat supplied to plaintiff by defendant was not dangerous when used in an ordinary manner. Defendant was, therefore, under no duty to warn or instruct as to its proper use. While a hotel guest is entirely warranted in expecting his innkeeper to exercise reasonable care to furnish facilities for the safety of guests, Ford v. Adams (1947), 212 Ark. 458, 206 S.W.2d 970, 207 S.W.2d 311, a proprietor has a corresponding right to assume that his invitee will perceive that which should be obvious to him upon the ordinary use of his own intelligence and experience. Miller v. Schull [Shull], supra [Fla., 48 So.2d 521]. Even assuming, arguendo, that plaintiff had no prior knowledge of bathmats, the proprietor of a public place is not an insurer of his guests, and is not required to anticipate the rare or occasional plaintiff who is totally unfamiliar with simple household chattels.

"No negligence can be attributed to defendant. Any injury sustained by plaintiff as a result of her fall was proximately caused by her own negligence in either failing to use the bathmat supplied or in using it in an unusual and improper manner."

The judgment of the trial court was affirmed (8 Cir. 1970) 435 F.2d 342.

In an annotation appearing in 18 A. L.R.2d 973, the annotator at page 974 said:

"The general rule that an innkeeper is not an insurer of the safety of his guests, but need only exercise ordinary and reasonable care in this regard, has been generally recognized in cases involving injuries to guests caused by defective furnishings or conditions in their rooms."

At page 980, § 7, the annotator cites and discusses several cases. One of the cases cited is Tomko v. Feldman (1937),

128 Pa.Super. 429, 194 A. 338, where the plaintiff's decedents were killed by carbon monoxide gas produced by a defective gas heater while they were guests in a hotel operated by the defendant, there being evidence to the effect that the defendant was aware of the dangerous condition of the heater.

In Ritchie v. Thomas (1950), 190 Or. 95, 224 P.2d 543, the Supreme Court of Oregon held that the fact that the plaintiffs were injured by poisonous fumes escaping from an allegedly defective heating appliance in a motel operated by the defendants did not give rise to a presumption that the defendant innkeepers were negligent in their maintenance of such appliance, and the fact that injuries resulted to the plaintiffs does not of itself establish that the defendant was negligent. The court approved an instruction that if the equipment was in good working order immediately before the alleged accident and if the defendant had no notice of any defect permitting the escape of fumes, and if the exercise of reasonable ordinary care would not have discovered any defect, then the defendant was not liable. At page 545 of 224 P.2d the court said:

> "There is evidence from which the jury might have concluded that the plaintiff or some member of his party was negligent. That evidence is to the effect that at 11 A.M. the defendant Ed Thomas found the room hot; all windows closed; the thermostat turned to its extreme height, to or above 80 degrees, with a floor rug which appeared to have been close to or against the door, and which was pushed back upon the opening of the door. In behalf of the defendants there was expert testimony that the furnace was in perfect condition, both before and after the injury."

In Branham v. Fordyce, 103 Ohio App. 379, 145 N.E.2d 471, the court held a directed verdict, based on assumption of risk, for the innkeeper proper where the plaintiff contended the deceased was asphyxiated by an unvented gas heater. The court noted:

> "The fact that the heater was unvented was patent and equally observable by both parties." (p. 474)

The burden of proving negligence and proximate cause as alleged in the complaint and the amendment thereto by a preponderance of the evidence was upon plaintiff, and in considering the facts as revealed by the evidence, the court must determine whether negligence on the part of defendants and proximate cause has been established by a preponderance of the evidence.

In Arkansas Model Jury Instruction No. 301, "negligence" is defined as "the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence in this case. It is for you to decide how a reasonably careful person would act under those circumstances."

When foreseeability is an issue, the instruction should also contain the following:

> "To constitute negligence an act must be one from which a reasonably careful person would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner."

In Hill v. Wilson (1949), 216 Ark. 179, at page 183, 224 S.W.2d 797, at page 800, the court said:

> "Negligence in a tort defendant is one thing, and proximate causation as a relation between negligence and injury is a separate and different thing. Yet the two things shade into each other.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "The concept of actionable negligence is relational because an act is never negligent except in reference to, or toward, some person or legally protected interest. In other words, a negligent act is one from which an ordinary prudent person in the actor's position —in the same or similar circumstances—would foresee such an appre-

ciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner."

In Hartsock v. Forsgren, Inc. (1963), 236 Ark. 167, at page 169, 365 S.W.2d 117, at page 118, the court said:

"To be negligent a person must be in a position to realize that his conduct involves a hazard to others. In the Hill case we described a negligent act as 'one from which an ordinary prudent person in the actor's position —in the same or similar circumstances—would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner.' Later, in Collier v. Citizens Coach Co., 231 Ark. 489, 330 S.W.2d 74, we added: 'Foreseeability is an element in the determination of whether a person is guilty of negligence and has nothing whatever to do with proximate cause.' Moreover, when the voluntary acts of human beings intervene between the defendant's act and the plaintiff's injury, the problem of foreseeability is still the same: Was the third person's conduct sufficiently foreseeable to have the effect of making the defendant's act a negligent one? Harper & James, The Law of Torts, § 20.5; Rest., Torts, § 447."

In Collier v. Citizens Coach Co. (1959), 231 Ark. 489, at page 492, 330 S.W.2d 74, at page 76, the court said:

"It should be remembered that while negligence must proximately cause a given result in order to justify a finding for the plaintiff on the allegations of the complaint; or a finding for the defendant on allegations of contributory negligence; negligence and proximate cause are two separate and independent things. Foreseeability is an element in the determination of whether a person is guilty of negligence and has nothing whatever to do with proximate cause."

In the case of Ben M. Hogan & Co. v. Krug (1961), 234 Ark. 280, at page 285, 351 S.W.2d 451, at page 453, the court said:

"'In determining whether an act of a defendant is the proximate cause of an injury, the rule is that the injury must be the natural and probable consequence of the act—such a consequence, under the surrounding circumstances of the case, as might and ought to have been foreseen by the defendant as likely to flow from his act; the act must, in a natural and continuous sequence, unbroken by any new cause, operate as an efficient cause of the injury. If a third person intervenes between the act of the defendant and the injury, and does a culpable act, for which he is legally responsible, which produces the injury, and without it the injury would not have occurred, and the act of the defendant furnished merely an occasion for the injury, but not an efficient cause, the defendant would not be liable.' "

In Arkansas Model Instruction No. 501 proximate cause is defined as:

" *  *  * it means a cause which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred."

In the amendment to the complaint plaintiff alleged that a violation of Ark. Stat.Ann., § 71–1118 (1957 Repl.), was an additional act of negligence on the part of the defendants which was a proximate cause of the injuries and damages complained of in the original complaint.

Section 71–1118, Ark.Stat.Ann., is as follows:

"Every person operating a tourist camp, motel or auto courts shall provide for the purpose of heating the individual rooms in said tourist court, motel or auto court, stoves or heating units adequately vented to carry the products of combustion to the outside atmosphere."

It will be noted that the statute does not expressly or by implication impose a civil liability for its violation, but

the violation, if any, by the defendants of the statute is evidence of negligence, not negligence per se.

In Ford v. Adams, supra, the court, in speaking of a violation of a somewhat similar statute, beginning at the bottom of page 464 of 212 Ark., page 973 of 206 S.W.2d said:

"A violator of this statute is subject to a fine, but the statute does not undertake to impose civil liability, although its violation is evidence of negligence."

In Rogers v. Stillman (1954), 223 Ark. 779, 268 S.W.2d 614, the court considered a claim for damages allegedly sustained on account of the destruction of certain crops by the appellant's cattle which were knowingly allowed to run at large along a public highway in the vicinity and broke into appellee's fenced fields. The court instructed the jury that the fact that the defendant allowed his stock to run at large and that they damaged the appellee's property is a circumstance which might be considered along with all other facts and circumstances in the case in determining whether the defendant is liable. The court at page 782 of 223 Ark., at page 616 of 268 S.W.2d stated:

"We have frequently held that, while the violation of a statute does not constitute negligence per se, it is evidence of negligence which the jury may consider, along with all other facts and circumstances, in determining the negligence or non-negligence of the defendant."

In Bridgforth v. Vandiver (1955), 225 Ark. 702, at page 707, 284 S.W.2d 623, at page 625, the court said:

"Appellants specifically call attention to Ark.Stats. § 75–623(b) which in effect provides that where a driver encounters a stop sign at an intersection he must proceed cautiously and yield to other vehicles not so obligated to stop. Violation of this statute however, if it was violated, did not constitute negligence but was only evidence of negligence to be considered by the jury."

Under the pleadings and the evidence adduced at the trial the following questions should be considered and answered: (1) Has the plaintiff proven by a preponderance of the evidence that the alleged negligence was a proximate cause of the death of Mr. Sander and the injuries to Mrs. Sander between January 8 and 12, 1970? (2) Were the defendants negligent in the operation and maintenance of the motel? (3) If both questions (1) and (2) are answered in the affirmative, then the question of the amount of damages would arise.

The court will consider the above questions seriatim.

The parties have furnished a complete transcript of the evidence, which the court has read in connection with the notes made by the court during the trial as and when the various witnesses, 21 in number, were testifying.

The plaintiff introduced 11 witnesses. The testimony of six of such witnesses was relevant only to damages, and in view of the conclusion reached by the court, it is not necessary to further consider the testimony of such witnesses.

The defendants introduced 10 witnesses, and in addition thereto the discovery deposition of Mrs. Sander taken on June 14, 1972, at Chicago, Illinois.

### Additional Facts

On Monday, January 12, 1970, when Mr. and Mrs. Kristof and the maid entered the room, Mr. Sander was sitting in a chair. Mrs. Sander was lying on the floor. The room temperature was stifling. The bathroom heater was "red hot" and open full. The living room unit was on its normal setting. Mr. Sander was clothed only in a pair of shorts. Mrs. Sander had on a slip which was up around her neck. The room was completely disheveled, clothes all over the place, Mr. Sander's wallet was on the floor with change all over the floor. His checkbook was under the dresser.

The bed clothes were pulled up. Two bottles of alcoholic liquor were in open view on the table together with several bottles of medicine, one of which was Pathinol with Phenobarb. All the windows were completely closed.

In the deposition of Mrs. Sander introduced as heretofore stated, she stated that she retired early on Sunday evening. Mr. Sander had a heavy cold and had taken a book to read and sit close to the heater in the living room area. At the time she retired the room had not become overheated, but she awoke during the night and that the room was so hot and sticky and "I could not breathe." She tried to get the door open but was unable to do so.

Immediately after the defendants and the maid entered the room, they called Dr. Jack Wright who had prescribed for Mr. and Mrs. Sander on Saturday, January 10, and had diagnosed Mr. Sander's trouble as a "rather severe respiratory infection, probably early pneumonia." The door to the room had been opened when Dr. Wright arrived, but the temperature was "quite hot." At an earlier date he described the temperature as being "hot as the devil" but testified that he did not know that "but that is the way I felt about it."

Mr. Sander's appearance was dusky, kind of a reddish tinge to his skin, particularly his face, and the first impression that Dr. Wright had was carbon monoxide intoxication because of the dusky tinge in Mr. Sander's complexion. His exact testimony (TR 108) is as follows:

"When I first saw Mr. Sander I thought he had expired. He was dusky, kind of a reddish tinge to his skin, particularly the face. I don't remember the particulars for Mrs. Sander, although she seemed to be rather dusky. The first thing I thought of, of course, was carbon monoxide intoxication because of the tinge of the color of the face specifically. Of course, I don't know * * *."

As heretofore stated, Mr. and Mrs. Sander were immediately hospitalized, and Dr. Wright ordered laboratory tests to determine if his initial impression or diagnosis was correct. The tests were made by two technicians, witnesses Mrs. Carroll Sloane and Mr. Phil Ingenito. Dr. Wright did not supervise the tests and knew nothing about the nature of the tests.

The test used is designated "presumptive test for carbon monoxide poisoning." It is conducted by diluting the patient's blood with a solution that reacts with carboxyhemoglobin. It is a qualitative as opposed to quantitative test, designed to show if the blood contains in excess of 20% carboxyhemoglobin. The test depends on the technician's interpretation of how long after the solution is added to the blood it takes the "characteristic red colors to disappear" (TR 159). Blood containing carboxyhemoglobin has a slightly slower rate of color change (TR 159). The two technicians who performed the test had not done so before (TR 31), and neither was a licensed physician. The technicians were of the opinion that both Mr. and Mrs. Sander's tests were initially positive. In their opinion, Mrs. Sander's second test was negative while Mr. Sander's continued to be positive (TR 150). Dr. Wright was of the opinion he had suffered carbon monoxide poisoning and that the terminal cause of death was "pneumonia and possibly a cardiac decompensation" (TR 145).

Dr. Wright frankly admitted that his experience in carbon monoxide cases was very limited as his specialty is traumatic surgery. In his experience as a physician he had never diagnosed and treated a carbon monoxide patient. He had seen five or six persons who had expired from monoxide poisoning. The witness recognized his limitations and consulted an internist at the hospital, Dr. Hoyt, who for some reason was not called as a witness for the plaintiff.

Dr. William Harville, a clinical pathologist, was called as a witness by defend-

ants. The record discloses that Dr. Harville is eminently qualified.

Q. Is your work now primarily or solely in the area of clinical pathology?

A. Yes, sir.

Q. Are you able to give us a very brief definition of a clinical pathologist as anatomical.

A. Clinical pathologist is one in charge of laboratory testing, the testing of chemically of blood, body fluids and other substances as related to human illness.

Q. Have you been able to test, both in your studies and as a pathologist, the test of a variety of tests concerning carbon monoxide poisoning?

A. Yes, sir, we have done that.

Q. Would you give the court the benefit of your experience in that?

A. Well, carboxyhemoglobin determination can be difficult in the sense that one must have moderately sophisticated equipment to do the test. There are so-called screening tests for carboxyhemoglobin, and that is useless in my experience because it is not quantitative, it is simply qualitative. Carboxyhemoglobin as a rule can be found in anybody driving in moderately heavy traffic on any street in Arkansas.

Q. With reference to the variety of tests of screening for carboxyhemoglobin I hand you a copy of what is an exhibit in the trial here. It has been testified to that this was the presumptive test for carbon monoxide that was conducted on Mr. and Mrs. Sander in the Ouachita Memorial Hospital. First of all, Doctor, are you familiar with that emergency toxicology pamphlet?

A. Yes, sir.

Q. Are you able to give us a description of the test that I have just shown you that was conducted on these two individuals?

A. Yes, this was a presumptive test for carbon monoxide. It is a fairly old test in medicine in that it is virtually the alkali denature test. The problem with the test is fairly non-specific, meaning that you have fetal hemoglobin, if you have other abnormal hemoglobin, this test is simply not positive. In our own laboratories we no longer do this test.

(TR 298–299).

Carboxyhemoglobin is defined as:

"A compound formed from hemoglobin on exposure to carbon monoxide, with formation of a covalent bond with oxygen and without change of the charge of the ferrous state." Dorland's Illustrated Medical Dictionary, 24th Ed.

Emergency presumptive tests such as were used in this instance are used to get "the doctor out of the spot of dealing with comotose patients." In dealing with comotose patients, often the attending physician suspects things like carbon monoxide, certain drugs, alcohol and hypoxia, which is defined as the lack of oxygen circulated in the body for various reasons. A number of things can cause hypoxia. Pneumonia is a very common cause.

The test most commonly used now for carbon monoxide poisoning is the gas chromatographic, in which a spectrophotographic curve can describe an absorption curve quite specifically. The witness testified that he would not accept the test that was given as being correct.

"There is carboxyhemoglobin in the human body, cigarette smokers or pipe smokers as much as 20% by volume. People in busy traffic inhaling exhaust from motor vehicles can have as high as 15%. People with severe exercise, normal level, one-tenth to two-tenths grams per cent may be doubled or tripled immediately after exercise. Patients with extensive pneumonia

have been found to have had levels certainly as much as two or three times normal carboxyhemoglobin in their blood during an attack of pneumonia." (TR 304).

The test was not quantitative and the presence of carboxyhemoglobin can often be normally found in taxi drivers and others who are in busy traffic inhaling exhausts from motor vehicles. Carbon monoxide often appears in smokers. The extended period of occupancy of the room in question by Mr. and Mrs. Sander increased the probability of hypoxia in the high level of carboxyhemoglobin. A person with carbon monoxide poisoning has a cherry red complexion. The witness further testified that from his study of the medical records and the manner in which the tests were conducted that "it looked more like in Mr. Sander's case extensive pneumonia and hypoxia although he had no blood test determination from the chart. The finding of greater than 20 percent carboxyhemoglobin even by the screen test, in the test itself points out that the 20 percent by this technique is considered normal; over the 20 percent may be toxic and then for it to be fatal it has to be over 40 percent, by this method. "The report was quite nonspecific."

Upon admittance to the hospital both Mr. and Mrs. Sander had temperature. The classical symptom of carbon monoxide poisoning is subnormal temperature (TR 309). Both Mr. and Mrs. Sander were exposed to the same atmosphere for the same length of time, yet their test results were different as to the carbon monoxide content, and in Dr. Harvill's opinion this would negate carbon monoxide poisoning.

The witness was strongly of the opinion that Mr. Sander had pneumonia and the finding of carboxyhemoglobin was simply an incidental finding, and in the absence of any accurate quantitation he would tend to discredit the report and would put the cause of the physical problem of Mr. Sander as pneumonia.

As to Mrs. Sander, it is conceivable that she could have been unconscious secondary to hypoxia in a hot room, very poor oxygen saturation. The hot room would deprive one of oxygen.

After a thorough consideration of all of the facts and circumstances established by the evidence, such as the unreliability of the tests, the inexperience of both laboratory technicians and Dr. Wright, the undeniable fact that Mr. Sander was suffering from pneumonia, the presence of barbituates and alcohol and the general condition of the room and of both Mr. and Mrs. Sander, the court is of the opinion that the plaintiff has failed to discharge the burden of proving by a preponderance of the evidence that the death of Mr. Sander and the temporary illness of Mrs. Sander were proximately caused by carbon monoxide asphyxiation.

The failure of plaintiff to meet the burden of proof in question one is sufficient to require the dismissal of the complaint and the amendment thereto, but the court feels that question two should be considered and determined.

Mr. Grover Dunn, a consulting engineer, whose qualifications are not controverted, was called soon after January 12, 1970, to investigate Room 21 in the motel and its facilities. He arrived on February 5, 1970, some three weeks following the incident that occurred on January 12. In his testimony he detailed what he did on that occasion, the measurements that were made, and the tests that were conducted in the room. The heater had not been changed or tampered with when he arrived. It had in nowise been altered. After making every known test of the heaters in the bathroom and bedroom, he was positive that neither heater produced carbon monoxide in dangerous quantities. He removed the bathroom heater and carried it to his laboratory in Marietta, Georgia, for further study and further experiments.

The court by order required the return and reinstallation of the bathroom heater. The plaintiff then contacted Dr. Ralph Smith of Franklin, Michigan, a Professor in the University of Michi-

gan School of Public Health. Dr. Smith possessed many degrees, primarily in an analytical chemistry and had been employed in the field of industrial hygiene in occupational health. He had written several papers for publication. In his own words he stated:

"I published on mercury, lead, analytical methods of ozone, air pollution on health, bones of animals, humans exposed to carbon monoxide, and carboxyhemoglobin and quite a few other things."

He further stated that he had performed the experiments listed in his publication on carboxyhemoglobin and actually made the tests himself on human subjects. He was likewise a toxicologist. In reference to carbon monoxide, he stated:

"Carbon monoxide is toxic because it displaces oxygen from hemoglobin forming a very stable compound known as carboxyhemoglobin which prevents the tissues from receiving the oxygen they need to live. That is essentially the sole reason why carbon monoxide is toxic. It is almost inert." (TR 158).

Dr. Smith, as an expert for plaintiff, met with defendant Mr. Kristof, Mr. Lewis Casey, a witness for plaintiff, and Mr. Dunn as an expert for the defendants, on June 24, 1972, and they made an examination of Room 21. The gas burner in the bathroom was installed and connected and turned on. It was allowed to burn first with the bathroom door closed and later with the door open and then the main burner in the bedroom was turned on and allowed to burn. During that period of several hours, they took carbon monoxide tests in the room and some carbon dioxide tests. The witness used tubes which changed color and these particular tubes changed from yellow to a dark color. As a result of the tests jointly made on June 24 very little carbon monoxide was created or found. None of the levels of carbon monoxide and dioxide were dangerous. The bathroom heater did not give off any smoke.

Both experts, Mr. Dunn for defendants and Dr. Smith for plaintiff, agreed that their tests revealed no presence of carbon monoxide even approaching dangerous levels. (TR 174 and 370). The type of the heater in the bathroom is of common use throughout the United States.

The fact that the heater was "red hot" when the room was entered on Monday morning signifies that the heater had plenty of air to burn. If it had not, it would have produced yellow tips and yellow flames, and finally the flame would reach out until it left the burner itself and would have expired.

The plaintiff contends that there was some discoloration on the wall immediately above the heater in the bathroom, and that such discoloration was evidence that the heater was not in proper working order. Mr. Dunn explained that above the heater you get heat and it comes right up the wall and you are bound to get some different coloring. The plaintiff also contends that the walls in both the bathroom and kitchenette were black with soot. Such contention is not supported by the evidence. Defendant's Exh. 1 taken shortly after the incident shows that there was no soot.

The plaintiff introduced no evidence as to any defect in either heater. On the other hand, the uncontradicted testimony shows that the heaters were cleaned carefully at the beginning of each fall and winter season and also carefully watched over by Mr. Kristof.

Mr. Bailey Graham of Harrison, Arkansas, had occupied Room 21 at various times preceding January 12, 1970. He last occupied the room for three or four days about the middle of December 1969, and he found no defect with the heating devices. In fact, he said they were easily operated. "All you had to do was turn them up or turn them down if you needed more heat."

The plaintiff contends that the defendants in the operation of the motel violated Sec. 71–1118, Ark.Stat.Ann., supra, and that the heating unit in the bathroom was not adequately vented.

Assuming that it was not adequately vented, and that can only be considered by the court under the applicable law as some evidence of negligence, it is in no-wise conclusive that the heater in the bathroom was defective or that it produced carbon monoxide.

The plaintiff has failed to prove by a preponderance of the evidence that the defendants failed to exercise requisite ordinary care for the safety of their guests.

For the reasons above stated, it is not necessary to determine whether Mr. and Mrs. Sander were contributorily negligent, nor is it necessary to consider and determine the claim of plaintiff for damages.

Upon a thorough consideration of all the facts and circumstances established by the evidence and under the applicable law, the court is convinced that the defendants were not guilty of alleged negligence which was a proximate cause of the injuries complained of, and judgment is being entered dismissing the complaint and the amendment thereto and adjudging costs against the plaintiff.